PEOPLE v DAVIS

Docket Nos. 132398, 138005. Submitted January 6, 1993, at Lansing. Decided May 3, 1993, at 9:15 A.M. Leave to appeal sought.

David R. Davis was convicted by a jury in the Hillsdale Circuit Court, Harvey W. Moes, J., of first-degree murder in connection with the death of his wife. He appealed.

The Court of Appeals *held:*

1. The trial court did not abuse its discretion in admitting evidence of succinylcholine, a muscle relaxant that can cause suffocation, found after analysis of tissue samples obtained from the exhumed and embalmed body of the victim. Although use of the analyses and tissue-sample preparation techniques to identify the presence of succinylcholine in embalmed tissue may have been novel, the analyses and sample-preparation techniques themselves are generally accepted in the scientific community, thereby rendering the test results properly admissible. Independent validation of the test results was unnecessary in the absence of a significant dispute regarding testing protocol.

2. Because certain evidence not provided by the prosecution to the defendant was lost or misplaced, rather than deliberately withheld, the defendant was not entitled to a jury instruction that the jury could draw inferences favorable to the defendant from the absence of the evidence.

3. The trial court did not abuse its discretion in denying the defendant a new trial on the basis of claimed newly discovered evidence consisting of criticism of the test analyst by his colleagues. Such evidence would have been useful for impeachment only, would have been cumulative in light of the analyst's cross-examination at trial, and could have been discovered

REFERENCES

Am Jur 2d, Criminal Law § 785; Evidence §§ 819, 825, 826; New Trial §§ 414-418.

Admissibility of experimental evidence to determine chemical or physical qualities or character of material or substance. 76 ALR2d 383.

Withholding or suppression of evidence by prosecution in criminal case as vitiating conviction. 34 ALR3d 16.

earlier. Also, the defendant failed to establish that introduction of the evidence would have affected the outcome of the trial.

4. The trial court did not abuse its discretion in admitting evidence of the ease with which succinylcholine can be obtained illegally. That evidence was relevant, and the defendant failed to show that its probative value was outweighed substantially by its prejudicial effect.

5. In expressing surprise over the defendant's decision to rest after offering only two witnesses, the prosecutor did not improperly comment regarding the defendant's decision not to testify.

6. The trial court abused its discretion in denying the petition for costs filed by the defendant's attorney. The case must be remanded for an award of costs. As an indigent, the defendant is entitled to a waiver of costs for court fees, transcripts, and the cost of expert witnesses where reasonably necessary for his defense.

Conviction affirmed; remanded for determination of costs.

1. CRIMINAL LAW — SCIENTIFIC EVIDENCE — GAS CHROMATOGRAPHY — MASS SPECTROMETRY — SAMPLES FROM EXHUMED AND EMBALMED BODIES.

The use of a gas chromatograph-mass spectrometer to identify an unknown substance is a standard and routine procedure in analytical chemistry; preparation of a tissue sample containing an unknown substance by means of ion-pair extraction and demethylation is also a standard technique; although the use of these techniques to identify the presence of a particular substance in embalmed tissue samples from an exhumed body may be novel, the evidence that results from the use of such generally accepted laboratory procedures is admissible as evidence in a murder trial where the proper protocol has been followed.

2. CRIMINAL LAW — EVIDENCE.

A defendant is entitled to have produced at trial all evidence bearing on guilt or innocence that is within the prosecution's control; where it is claimed that the prosecution has withheld evidence, a court must consider whether suppression was deliberate, whether the evidence was requested, and whether the defendant could have put the evidence to significant use.

3. CRIMINAL LAW — NEW TRIAL — NEWLY DISCOVERED EVIDENCE.

To merit a new trial on the basis of newly discovered evidence, a defendant must show that the evidence is newly discovered, not merely cumulative, probably would have caused a different result, and was not discoverable and producible at trial despite

reasonably diligent efforts to do so; newly discovered evidence is not a ground for a new trial where it would be used merely for impeachment purposes.

*Frank J. Kelley,* Attorney General, *Thomas L. Casey,* Solicitor General, and *Mark E. Blumer,* Assistant Attorney General, for the people.

*Bleakley & McKeen, P.C.* (by *Thomas H. Bleakley*), for the defendant.

Before: MURPHY, P.J., and MICHAEL J. KELLY and WAHLS, JJ.

MURPHY, P.J. Defendant was convicted after a jury trial of first-degree murder, MCL 750.316; MSA 28.548, and sentenced to life in prison without possibility of parole. Defendant appeals from his conviction, and also appeals from the trial court's denial of costs. We affirm defendant's conviction, but reverse the trial court's denial of costs, and remand to the trial court for a determination of costs.

This case arises from the death of Shannon Mohr, defendant's wife. Ms. Mohr died on July 23, 1980, in what initially appeared to be a horseback-riding accident. The facts leading to her death are, to say the least, bizarre. In the mid-1970s, defendant, a former pharmacology student, dated Kay Kendall. During that relationship, defendant told Kendall about a murder committed using succinylcholine (SCH), a muscle relaxant that can result in suffocation if injected. Defendant described the use of SCH to kill someone as the "perfect crime." In 1978, defendant created a false identity, obtaining a Florida driver's license under the name of David Meyer Bell. Defendant then asked Ms. Kendall to marry him. Ms. Kendall decided that she could not marry defendant, and they broke off the relationship in April 1979.

That same month, defendant began an intense relationship with Jeanne Hohman. After approximately one month, the couple discussed marriage. Defendant indicated that the couple could get married in Las Vegas, but Ms. Hohman was reluctant. They again discussed marriage in July 1979, but Ms. Hohman was still undecided.

On August 4, 1979, defendant attended the wedding of Tom and Regina Davis. Before the wedding, defendant asked Tom Davis whether any single women would be attending the wedding. Shannon Mohr, the murder victim, met defendant at the wedding. Unbeknownst to Jeanne Hohman, defendant and Mohr began an intense relationship. Defendant and Ms. Mohr were married in Las Vegas on September 24, 1979. On October 2, 1979, defendant and Ms. Mohr purchased life insurance policies, each with a face value of $110,000 and each person naming the other as the beneficiary. The policies contained double indemnity clauses for accidental death.

Approximately one week before defendant married Shannon Mohr, he told Jeanne Hohman that he could not see her for about one year and that he was doing something dangerous that he could not disclose to her. Defendant told Ms. Hohman that it would appear that he was married, and that she should ignore anything that she read about him in the newspapers. Ms. Hohman believed that defendant was working for the government. About one month later, defendant resumed his relationship with Ms. Hohman without revealing that he had married Ms. Mohr. During this period, defendant told Ms. Hohman that the government would pay him about $250,000 for his secret work. In June 1980, Ms. Hohman asked defendant how much longer the secret government assignment would continue. Defendant indicated

that it would continue for three or four more weeks.

After defendant married Ms. Mohr, he purchased two riding horses and kept them at his farm. On July 23, 1980, defendant and Ms. Mohr rode the horses to the home of their neighbors, the Brittons. Defendant did not allow Ms. Mohr's nephew, who was staying at the farm with Ms. Mohr's mother, to accompany them, nor did defendant permit his dogs to accompany them, although the nephew and the dogs usually did so. Defendant also did not allow the Brittons' son to ride with them back to defendant's farm, although the Brittons' son had ridden with them in the past.

After visiting the Brittons, defendant and Ms. Mohr rode through a small wooded area. About twenty-five minutes later, defendant rode swiftly back to the Brittons' farm. Defendant was excited and sweating and had blood on his shirt. Defendant told the Brittons that Mohr had fallen from her horse and was seriously injured and should be taken to the hospital immediately. Defendant and Richard Britton drove to the edge of the wooded area, where Ms. Mohr was lying with her shoes off, her blouse undone, and her skin a bluish-gray color. Ms. Mohr was taken to the hospital, where she was pronounced dead.

Police investigating the site discovered a half-buried rock covered with blood and Mohr's untied shoes about eight feet from the rock. Ms. Mohr's shoes were given to defendant and have not been located since. Mr. and Mrs. Britton later returned to the accident scene, where they noticed circular bruises on two branches, as though horses had been tied there. They also observed horse manure about seven feet from each branch, further suggesting that horses had been tied there.

Witnesses testified that defendant said that he

and Ms. Mohr had been riding through the woods single file when he heard her scream, turned around, and saw her lying on the ground near her horse. Defendant stated that he dragged her to the side of the woods and then rode to the Brittons' house for help. Witnesses further testified that shortly after Ms. Mohr's death, defendant informed them that Ms. Mohr had not had life insurance.

While at the hospital, defendant indicated that Ms. Mohr's body would be cremated. Ms. Mohr's parents objected to cremation and argued with defendant. Mr. Britton persuaded defendant to allow Ms. Mohr's parents to take her body with them when they returned to Ohio. Ms. Mohr's body was temporarily placed in a funeral home in Hudson, Michigan, awaiting transport to a funeral home in Toledo. Ms. Mohr's clothing was removed at the funeral home and apparently has been lost. Ms. Mohr's body was then moved to a funeral home in Toledo and embalmed.

While at the hospital on July 23, 1980, Shannon Mohr's mother noticed scratches on defendant's face and hand. On July 24, 1980, defendant visited Regina Davis, who observed that defendant had straight scratches on his face. Defendant claimed that he received the scratches from tree branches while riding. On July 25, 1980, a funeral director, Roberta Scherting, also observed the scratches and noted that defendant had makeup on his face.

On or about July 29, 1980, defendant and Jeanne Hohman left for Florida. They stopped in Toledo, where defendant dropped her off at a mall, claiming that he had some errands. Defendant then returned some pillows to Shannon Mohr's parents at their home in Toledo and told them that he was going to a desert to think. He did not disclose that Jeanne Hohman was traveling with

him. According to Ms. Hohman, defendant did not tell her that he had been married to Shannon Mohr nor did he tell her that she had died in an accident and had been buried a few days earlier, nor did defendant behave as though someone close to him had died. Defendant and Ms. Hohman stayed in Florida one week, after which Ms. Hohman flew back to Michigan.

Ms. Mohr's parents became suspicious about the cause of her death when they reflected on defendant's denial of the existence of her life insurance policy. When the Mohrs learned that defendant was attempting to collect on the $220,000 life insurance policy, they filed an interpleader action in federal court. Defendant defaulted by not appearing in the lawsuit.

On August 25, 1980, Drs. Steven Fazekas and Renata Fazekas performed an autopsy of Ms. Mohr's exhumed body. When Mohr's parents suggested that she died as the result of foul play, the Fazekases instructed the toxicology laboratory at the Medical College of Ohio (MCO) to perform a full-spectrum drug scan. Tissue samples were sent to the toxicology laboratory at MCO. Dr. Robert Forney, Jr., was the Director of Toxicology at the MCO laboratory. The tissue samples were maintained in cold storage awaiting testing instructions. Thomas Carroll, a toxicologist at the laboratory, did a routine toxicology scan on the tissue samples and found a significant peak on the gas chromatograph, but was unable to identify the chemical that produced the peak. Forney and Carroll then sent prepared tissue samples to other laboratories with mass spectrometers, including the Michigan State Police crime laboratory. None of the other laboratories duplicated or identified the peak obtained at MCO. Carroll and Forney continued their analysis and reviewed their results

for possible error as a source of the unidentified peak.

Michigan State Police Detective Sergeant Donald Brooks, investigating Ms. Mohr's death, hypothesized that Ms. Mohr had been chemically immobilized before her death. He interviewed several veterinarians who had worked at defendant's farm, and one suggested SCH. In addition, Tori Abrams, Shannon Mohr's cousin, testified that in the summer of 1980, she visited Ms. Mohr at defendant's farm. Ms. Abrams observed ten or twelve syringes banded together in the refrigerator and medicine bottles labeled Anectine, a brand name for SCH, in the freezer.

SCH consists of molecules of acetylcholine (ACH), which is crucial to the chemical reaction between nerve endings and muscle fibers. SCH blocks the chemical reaction, effectively paralyzing voluntary muscle activity and respiratory ability. SCH acts within seconds of intravenous injection, but more slowly with subcutaneous injection. Suffocation would result within approximately five minutes of the injection of the drug.

When Brooks suggested the possibility of SCH to Carroll and Forney, neither was receptive. SCH theoretically should not have produced the unidentified peak on the chromatograph because SCH has a strong affinity for water and cannot normally be extracted from tissues in which it is present. In addition, SCH breaks down in the body into component parts that are naturally present in the human body. To eliminate SCH as a possible chemical producing the unidentified peak, Carroll tested SCH with the gas chromatograph and obtained an identical match with the unknown peak. Carroll and Forney obtained the same result on five different gas-chromatograph columns in their laboratory.

To further test the results, Carroll and Forney

arranged to use a mass spectrometer that was prepared for analysis of drugs in the same chemical family as SCH at the Karolinska Institute in Stockholm, Sweden. Identification by mass spectrometer of an unknown drug in a tissue sample requires preparation of the sample. Forney and Carroll developed a process to prepare the sample, which they believed allowed them to detect SCH in a tissue sample. Dr. Forney testified that the procedures used were well accepted. First, they extracted the unknown drug, which they assumed to be SCH, from water molecules in the tissue by "ion-pair extraction" using hexanitrodiphenylamine. They then altered the chemical structure of SCH, using sodium benzene thiolate, and washed the compound in pentane. If the unknown drug was SCH, it theoretically would have been present after this process. Forney and Carroll performed this analysis several ways, both with and without an internal standard to control possible inaccuracies or contamination. Forney concluded from the test results that pure SCH was present in Mohr's body.

Another autopsy of Mohr's body was performed to locate the injection site of SCH. The second autopsy revealed a puncture wound and several bruises, including bruises on the right wrist and shoulder. Forney returned to Stockholm to analyze tissues from the second autopsy. Forney detected high concentrations of SCH around those bruises and concluded that Mohr had been injected with SCH, and that the drug caused Ms. Mohr's death.

Peter Goldblatt, M.D., an anatomical pathologist, examined Mohr's upper right shoulder and located a cyst consistent with subcutaneous injection of SCH. James Harris, M.D., Ph.D., examined Mohr's brain, brain stem, and upper spinal column, and concluded that Mohr had suffered a slight contrecoup injury, damage to the brain on

the side opposite the impact, which did not result in Mohr's death, and possibly did not even render her unconscious.

On October 13, 1981, a one-man grand jury indicted defendant for first-degree murder. On December 24, 1981, defendant, who was sailing on his boat near Haiti with a new girl friend, Monica Yoezle, called his attorney in Michigan. Defendant then left his boat and Ms. Yoezle in Haiti, explaining that he was returning to Michigan to resolve some legal issues relating to his alleged negligence in the death of his wife. He told Ms. Yoezle that she should go to Florida and obtain a job until he returned. Ms. Yoezle never saw defendant again until the trial.

Defendant's location was unknown until January 1989. In 1987, Michigan State Police and the television show "Unsolved Mysteries" produced an episode about Mohr's death, which was aired in November 1987. No leads developed until the episode was rerun in December 1988, after which a tip was received in January 1989, resulting in defendant's arrest in Pago Pago, American Samoa. Defendant was subsequently convicted of first-degree murder and sentenced to life in prison. Defendant now appeals.

I

Defendant first contends that the trial court erred so as to require reversal in permitting the introduction of Forney and Carroll's test results relating to SCH. Before trial, defendant moved for a *Davis-Frye* hearing,[1] at the conclusion of which the trial court held that the results of Carroll and Forney's analysis were admissible at trial. Defen-

---

[1] *People v Davis,* 343 Mich 348; 72 NW2d 269 (1955); *Frye v United States,* 54 US App DC 46; 293 F 1013 (1923).

dant argues that the evidence resulted from a novel scientific testing procedure, that there has been no confirmation, replication, or independent validation of the test results or procedure, and that the evidence was therefore inadmissible. We disagree.

Under the *Davis-Frye* rule, adopted from *People v Davis,* 343 Mich 348; 72 NW2d 269 (1955), and *Frye v United States,* 54 US App DC 46, 47; 293 F 1013 (1923), novel scientific evidence must be shown to have gained general acceptance in the scientific community to be admissible at trial. *People v Young (After Remand),* 425 Mich 470, 473, 479-480; 391 NW2d 270 (1986); *People v Vettese,* 195 Mich App 235, 238; 489 NW2d 514 (1992). The party offering the evidence has the burden of demonstrating its acceptance in the scientific community. *People v Adams,* 195 Mich App 267, 269; 489 NW2d 192 (1992); *People v Gistover,* 189 Mich App 44, 46; 472 NW2d 27 (1991). The purpose of the rule is to prevent the jury from relying upon unproven and potentially unsound scientific methods. *People v Gonzales,* 415 Mich 615, 623; 329 NW2d 743 (1982). The *Davis-Frye* test is applied only to new scientific principles or techniques, however. A party need not show the general acceptance of an already established test. *People v Marsh,* 177 Mich App 161, 164, 167; 441 NW2d 33 (1989).

According to expert testimony at trial, the use of a gas chromatograph-mass spectrometer to identify an unknown substance is a standard and routine procedure in analytical chemistry. Preparation of a sample containing an unknown substance by means of ion-pair extraction and demethylation is also a standard technique. Thus, although use of these techniques to identify the presence of sch in embalmed tissue samples may be novel, the evi-

dence resulted from the use of generally accepted laboratory procedures. Therefore, the prosecution was not required to show the general acceptance of these already accepted procedures. See *Marsh, supra,* 167.

Moreover, even if the *Davis-Frye* test did apply where, as here, a unique or novel purpose was the goal of applying generally accepted techniques, the evidence was still admissible. During the *Davis-Frye* hearing, numerous experts testified that the protocol described by Forney was an accurate and repeatable process for detecting SCH in embalmed animal tissue, and that the methods and analyses used were well recognized, generally accepted, and necessary to properly identify drugs such as SCH. Expert testimony described Forney's protocol as a "method of choice" and "the most likely to give accurate quantitative measures of the compound if it's there." Independent validation is not necessary where no significant dispute exists over the testing protocol. *People v Stoughton,* 185 Mich App 219, 228-229; 460 NW2d 591 (1990). In addition, scientific testing to determine the presence of SCH in an exhumed body has previously been held admissible. *Jones v State,* 716 SW2d 142, 152, 154 (Tex App, 1986). See also *Coppolino v State,* 223 So 2d 68, 69-71 (Fla App, 1969). In light of the evidence presented at the *Davis-Frye* hearing regarding the general acceptance, reliability, and validity of the methods used by Forney and Carroll, the trial court did not abuse its discretion in admitting the results obtained by using these standard analytical-chemistry techniques.

II

Defendant next contends that the trial court erred so as to require reversal in failing to grant a

new trial when the prosecution purportedly concealed critical evidence in violation of a discovery agreement. Defendant argues that the prosecution failed to produce photographs of the scene of the crime, Mohr's clothing and shoes, photographs from the first autopsy, and information regarding blood under Mohr's fingernails. We disagree.

A defendant is entitled to have produced at trial all evidence bearing on guilt or innocence that is within the prosecutor's control. *People v Calloway,* 169 Mich App 810, 820; 427 NW2d 194 (1988); *People v Taylor,* 159 Mich App 468, 478; 406 NW2d 859 (1987). Where evidence is suppressed, the proper considerations are whether (1) suppression was deliberate, (2) the evidence was requested, and (3) in retrospect, the defense could have significantly used the evidence. *People v Paris,* 166 Mich App 276, 283; 420 NW2d 184 (1988). In this case, the prosecutor did not refuse to produce the evidence. Rather, the evidence that defendant claims was not produced was simply not available. Photographs of the crime scene and autopsy were misplaced, Mohr's shoes were returned to defendant, Mohr's clothing was apparently lost by the funeral home, and the preparation of Mohr's body for burial resulted in losing potential blood samples under her fingernails. Defendant has failed to show that these materials were discoverable material that the prosecutor refused to disclose. See *Calloway, supra,* 820-821.

III

Defendant further contends that the trial court erred so as to require reversal in failing to instruct the jury that, where the prosecution fails to make reasonable efforts to preserve material evidence, the jury may infer that the evidence would have

been favorable to defendant. We review jury instructions in their entirety to determine whether the trial court erred so as to require reversal. *People v Caulley,* 197 Mich App 177; 494 NW2d 853 (1992). Even if the instructions are imperfect, there is no error if they fairly presented the issues to be tried and sufficiently protected the defendant's rights. *Id.; People v Wolford,* 189 Mich App 478, 481; 473 NW2d 767 (1991). In this case, defendant has not demonstrated that the prosecutor acted in bad faith in failing to produce the evidence. Rather, as discussed above, the evidence simply did not exist or could not be located. Under the circumstances, the trial court did not err in declining to give this instruction.

IV

Defendant further argues that he is entitled to a new trial because the prosecutor failed to reveal that substantial criticism of Forney's method existed and that colleagues at MCO had criticized Forney's work. Defendant argues that this is newly discovered evidence entitling him to a new trial. We disagree.

A trial court's ruling on a motion for a new trial based upon newly discovered evidence will not be reversed absent an abuse of discretion. *People v Sharbnow,* 174 Mich App 94, 104; 435 NW2d 772 (1989); *People v Beckley,* 161 Mich App 120, 130; 409 NW2d 759 (1987). To merit a new trial on the basis of newly discovered evidence, a defendant must show that the evidence (1) is newly discovered, (2) is not merely cumulative, (3) would probably have caused a different result, and (4) was not discoverable and producible at trial with reasonable diligence. *Sharbnow, supra,* 104; *People v Stricklin,* 162 Mich App 623, 631-632; 413 NW2d

457 (1987). Newly discovered evidence is not ground for a new trial where it would merely be used for impeachment purposes. *Sharbnow, supra,* 104; *Stricklin, supra,* 632.

In this case, defendant's newly discovered evidence of the existence of criticism of Forney's work would primarily serve as impeachment. Further, the criticism of Forney's work is not newly discovered evidence, but instead merely assists in the understanding of the materiality of the previously known evidence. Moreover, defendant cross-examined Forney and Carroll at trial and presented testimony that criticized Forney's analysis. The newly discovered testimony is therefore essentially cumulative, and there has been no showing that the introduction of the evidence would have affected the outcome. We also note that defendant could have earlier discovered the supposed criticism of Forney by his colleagues simply by asking them for their opinions. We therefore hold that the trial court did not abuse its discretion in failing to grant a new trial.

v

Defendant further contends that the admission of evidence regarding possible illegal sources of SCH deprived defendant of a fair trial. At trial, the prosecution presented evidence that a police officer posing as a high school chemistry teacher easily obtained free quantities of SCH. Defendant argues that the introduction of this evidence and the prosecutor's comment that the quantity obtained was enough to "kill an army" was so prejudicial as to outweigh any probative value. We disagree.

The decision to admit evidence is within the sound discretion of the trial court and will not be disturbed absent an abuse of discretion. *People v*

*Watkins,* 176 Mich App 428, 430; 440 NW2d 36 (1989). Evidence is relevant if it tends to make the existence of a fact at issue more or less probable than it would be without the evidence. MRE 401; *People v Wilkins,* 184 Mich App 443, 446; 459 NW2d 57 (1990). While all relevant evidence is generally admissible pursuant to MRE 402, relevant evidence may be excluded if the danger of unfair prejudice substantially outweighs the probative value of the evidence. MRE 403; *People v Spearman,* 195 Mich App 434, 445; 491 NW2d 606 (1992). In this case, the evidence introduced was probative of the availability of SCH and was therefore relevant. Because there has been no showing that the evidence was so inflammatory or prejudicial that a jury would give preemptive weight to this evidence, the trial court did not abuse its discretion in admitting the evidence.

VI

Defendant also contends that the prosecutor in effect commented regarding defendant's failure to testify and thereby deprived him of a fair trial. This Court examines the record and evaluates the prosecutor's remarks in context to determine whether defendant was denied a fair and impartial trial. *People v Foster,* 175 Mich App 311, 317; 437 NW2d 395 (1989). A prosecutor may not comment upon a defendant's failure to testify. MCL 600.2159; MSA 27A.2159; *People v Guenther,* 188 Mich App 174, 177; 469 NW2d 59 (1991).

In this case, defendant presented only two witnesses before resting. In response to the trial court's inquiry regarding rebuttal, the prosecutor stated:

To be absolutely frank with the court, I am a

little surprised with this development. May I take five minutes to consider this, Your Honor?

It appears that the prosecutor was simply surprised because he had anticipated further presentation on the basis of defendant's opening statement. In response to defendant's motion for a mistrial, the trial court was also surprised and did not recognize any insinuation by the prosecutor that defendant had failed to testify on his own behalf. We also see no connection between the prosecutor's comment and defendant's failure to testify. We therefore conclude that this comment did not deny defendant a fair and impartial trial.

VII

Defendant also contends that the trial court abused its discretion in denying his attorneys' petition for costs. We agree. Defendant, as an indigent, was entitled to a waiver of costs for court fees, transcripts, and expert witness services reasonably necessary for his defense. See MCR 6.433; MCL 775.15; MSA 28.1252. We note that the prosecution essentially agrees that defendant is entitled to costs, and disputes only the nature and amount of those costs.

Defendant's conviction is affirmed. We reverse the trial court's denial of costs, and remand to the trial court for a determination of costs. We do not retain jurisdiction.