# Order

Michigan Supreme Court
Lansing, Michigan

September 29, 2010

Marilyn Kelly,
Chief Justice

Michael F. Cavanagh
Maura D. Corrigan
Robert P. Young, Jr.
Stephen J. Markman
Diane M. Hathaway
Alton Thomas Davis,
Justices

141254

PEOPLE OF THE STATE OF MICHIGAN,
      Plaintiff-Appellant,

v

      SC: 141254
      COA: 288032
      Macomb CC: 2007-004766-FC

MICHAEL RALPH GEORGE,
      Defendant-Appellee.

_____/

On order of the Court, the application for leave to appeal the May 4, 2010 judgment of the Court of Appeals is considered, and it is DENIED, because we are not persuaded that the question presented should be reviewed by this Court.

CORRIGAN, J. (*dissenting*).

I respectfully dissent from the Court's decision to deny the prosecutor's application for leave to appeal. I would grant leave to appeal.

In 2008, defendant Michael George was convicted of several charges involving the 1990 murder of his wife, Barbara George, at the Comics Book World retail store, which the couple owned together. Indeed, a jury convicted defendant of first-degree premeditated murder,[1] insurance fraud,[2] obtaining property by false pretenses,[3] and possession of a firearm during the commission of a felony.[4] The trial court thereafter granted defendant's motion for a new trial because three police tip sheets were discovered by the police after sentencing. On remand from this Court, the Court of Appeals affirmed the trial court's decision. It held that the trial court did not abuse its discretion in determining that defendant was entitled to a new trial on the basis of newly discovered evidence.[5] However, the Court of Appeals failed to fully grapple with the evidence proving defendant's guilt beyond a reasonable doubt as well as the critical fourth prong of *People v Cress*, 468 Mich 678 (2003). I would grant leave to appeal to consider whether defendant established that the three police tip sheets "make[] a different

---

[1] MCL 750.316(1)(a).

[2] MCL 500.4511(1).

[3] MCL 750.218.

[4] MCL 750.227b.

[5] *People v George*, unpublished opinion per curiam of the Court of Appeals, issued May 4, 2010 (Docket No. 288032).

result probable on retrial"[6] and whether the trial court's decision to grant defendant a new trial based on newly discovered evidence fell outside the range of "reasonable and principled outcome[s]."[7]

## I.  EVIDENCE INTRODUCED AT TRIAL

The prosecution's theory was that defendant murdered Barbara because he was unhappy, was involved with another woman, and had financial incentives to kill his wife. The defense contended that an unknown assailant murdered Barbara during an armed robbery at Comics Book World and that defendant had been at his mother's house at the time of the murder.  The prosecution introduced powerful circumstantial evidence that supported the jury verdict and discredited the defense theory of the case.

The prosecution established that defendant and Barbara had a troubled marriage but that Barbara did not believe in divorce.  Although defendant told the police that his marriage was fine, several witnesses testified about the couple's marital discord.  One witness recalled several different occasions where defendant would "storm[] out" of the couple's house and leave Barbara crying inside.  Another witness who worked at a nail salon in the same plaza as Comics Book World observed "30, 35" arguments between defendant and Barbara during the "[l]ast couple months."  This witness described the couple's arguments as "loud" and about "money or gambling."  She specifically recalled that one "extremely loud argument" occurred about 2:30 p.m. on the day of Barbara's murder.  The witness characterized the couple's final argument as "more violent" and stated that defendant "sounded much angrier than [during their] normal arguments."  Just six days before the murder, defendant told store customer Theresa Danieluk that his wife was fat and unattractive.  Defendant also stated that if he was not married to Barbara, he would take his children and move to Florida.

Defendant also denied being involved in any extramarital affairs to police investigators.  Yet, several witnesses testified about defendant's extramarital affairs and his flirtatious behavior toward other women.  Defendant had an extramarital affair with store employee Renee Kotula.  A customer recalled witnessing "a lot of flirting" between defendant and Kotula.  Defendant's next-door neighbor observed defendant embracing and kissing Kotula a few weeks after the murder.  About one month after Barbara's murder, Kotula moved in defendant's house and began living with defendant and his children.  Defendant also had a six-month extramarital affair with Patrice Sartori while Barbara was pregnant with the couple's second child.  Before Barbara's murder, defendant remarked to a male customer about Barbara wearing a demure nightgown "in a dissatisfying tone."  Also, defendant acted "rather flirtatious" toward the store's female

---

[6] *Cress*, 468 Mich at 692.

[7] *Maldonado v Ford Motor Company*, 476 Mich 372, 388 (2006).

customers. Less than one month after his wife's death, defendant followed a female customer from Comics Book World and gave her a handwritten note that contained his phone number and stated "[y]ou look very, very, very pretty today. Thanks for coming in. Sincerely, Michael."

At the time of the murder, defendant, a former insurance salesman, was the beneficiary of two life insurance policies on Barbara totaling $130,000. By contrast, defendant only maintained one life insurance policy on himself in the amount of $30,000. He permitted a second policy on his life in the amount of $50,000 to lapse during the same period. Defendant also displayed his interest in receiving the life insurance proceeds from Barbara's death as soon as possible. While attending visitation hours at the funeral home for Barbara, one witness heard defendant ask his mother, "Mom, did you call the insurance company today?" Ultimately, defendant secured the life insurance proceeds less than three weeks after Barbara's death. Defendant also subsequently collected $12,604 in insurance proceeds for the alleged robbery of comic books that occurred at the store.

Additionally, many witnesses testified about defendant's peculiar statements and behavior during the period surrounding Barbara's murder. When defendant arrived at Comics Book World as the police were processing the crime scene, Detective Donald Steckman advised defendant that "there had been a problem in the store and his wife was in the hospital and that one of our detectives would be taking him to the hospital." Without giving defendant any information about where Barbara was found or about whether she suffered any head injuries, defendant volunteered to Detective Steckman that "something must have fallen on her head in the back room." Defendant made a similar statement without any prompting to Lieutenant Donald Brook while Lieutenant Brook drove defendant to the hospital. Barbara's youngest brother testified that when defendant arrived at the hospital, defendant's demeanor was "cold" and that defendant "didn't come up and hug anybody." Barbara's sister-in-law recalled that when someone notified the family that Barbara had died, defendant displayed his "relief, like almost a sigh." During visitation hours at the funeral home and at the funeral itself, several witnesses testified that defendant wore dark sunglasses and shed no tears. Defendant's friend also testified that when he suggested to defendant that their friends establish a reward for information concerning Barbara's murder, defendant told him that the police did not want anyone to offer a reward. That statement was false according to police witnesses who would have welcomed the establishment of a reward.

Other evidence discredited the defense theory that an unknown assailant murdered Barbara during an armed robbery. A prosecution expert testified that armed robberies of comic book stores are exceedingly rare. The display cases and the cash registers in the store had not been disturbed. One police officer found approximately $30 in the first cash register and $715 in the second cash register. The police also discovered more than $400 in Barbara's pocket and five pieces of jewelry, including a $2,500 ring, on her

person. Although defendant initially told police that $2,000 was missing from the safe and that two boxes of expensive comic books that had been sitting on the safe disappeared, he later recanted his story about $2,000 being missing. The evidence technician who processed the crime scene testified that the safe "didn't have any prime [sic] marks on it or anything on it and it was unlocked but the door was closed." The back door to the store also did not have any pry marks. During the investigation to trace the stolen comic books listed by defendant, a customer told police that he previously purchased one of the comic books that defendant had listed as stolen. When the police informed defendant of the customer's statement, defendant recanted and asserted that the comic book in question was not one of the comic books that disappeared. This and other evidence buttressed the prosecution's theory that defendant filed a false insurance claim to recover insurance proceeds for the theft of two boxes of expensive comic books that never occurred. The prosecution also established that the defense's theory about an armed robbery differed from what defendant told investigators when the police contacted defendant after reopening their investigation in 2007. At that time, defendant disavowed his prior claims about an armed robbery and told the police that the killer murdered Barbara to exact revenge for defendant's gambling debts. Finally, the prosecution introduced testimony casting doubt on defendant's alibi. Defendant initially told police that he left Comics Book World at "approximately 4 o'clock" and that he arrived at his mother's house in Hazel Park "in the neighborhood of 5 p.m." where he remained until "approximately 7:30 p.m.." Yet Michael Renaud, a regular customer, testified that when he called Comics Book World between 5:15 p.m. and 5:45 p.m. on the day of the murder, defendant answered the phone and they spoke for "[l]ess than five minutes."

In sum, the prosecution introduced voluminous proofs against defendant. The Court of Appeals correctly observes that most of the evidence against defendant is circumstantial. It is undisputed, however, that "circumstantial evidence and reasonable inferences may be sufficient to prove the elements of a crime."[8] I would not discount the evidence presented by the prosecution merely because that evidence is circumstantial in nature.

## II. THREE NEWLY DISCOVERED POLICE TIP SHEETS

The newly discovered evidence in this case consists of seven police tip sheets, which a police officer located after sentencing in a folder that had slipped between two other folders. The Court of Appeals concluded that three of the police tip sheets were significant enough to entitle defendant to a new trial. In *People v Cress*, this Court explained that in order to obtain a new trial on the basis of newly discovered evidence, the defendant must show that:

---

[8] *People v Tanner*, 469 Mich 437, 444 n 6; (2003).

(1) 'the evidence itself, not merely its materiality, was newly discovered'; (2) 'the newly discovered evidence was not cumulative'; (3) 'the party could not, using reasonable diligence, have discovered and produced the evidence at trial'; and (4) the new evidence makes a different result probable on retrial.[9]

The Court of Appeals failed to grapple adequately with the fourth prong of *Cress*. The three newly discovered police tip sheets do not make a different result probable on retrial. The Court of Appeals also erred insofar as it relied on the impeachment value of the three police tip sheets because "where the new[ly discovered] evidence is useful only to impeach a witness, it is deemed merely cumulative."[10]

The first police tip sheet describes a phone call that police received from an unidentified male informant one day after defendant's wife was murdered. The informant stated that he called the store at approximately 5:55 p.m., and the man who answered the phone said "HELLO." When the informant asked whether the store had a certain hockey card in stock, the man said "NO" and hung up the phone. The informant thought that this was a strange way for someone to answer the phone and respond to a customer's question. The Court of Appeals offers no explanation concerning why this first tip sheet assists the defense any more than it assists the prosecution. The tip sheet establishes that a man answered the phone at Comics Book World about the time of the murder. Defendant, a male co-owner of the store, presumably would answer the ringing phone and respond to a customer's question. Assuming that the defense would have used the tip sheet to attack the sufficiency of the initial police investigation, the prosecution could have used the tip sheet to corroborate the testimony of Michael Renaud and to place defendant in the store immediately before the murder.[11] Consequently, the first tip sheet does not seem to make a different result more probable on retrial.

The second police tip sheet describes a phone call that police received 11 days after the murder from a woman who identified herself as Martha Olson of Rogers City. Olson stated that she had a phone conversation with an unidentified man who "may own

---

[9] *Cress,* 468 Mich at 692, quoting *People v Johnson*, 451 Mich 115, 118 n 6; (1996).

[10] *People v Barbara*, 400 Mich 352, 363; 255 NW2d 171 (1977); see also *People v Davis*, 199 Mich App 502, 516; 503 NW2d 457 (1993) ("Newly discovered evidence is not ground[s] for a new trial where it would merely be used for impeachment purposes.").

[11] Barbara George called Renee Balsick from the store at approximately 6:00 p.m. on the day of the murder. Balsick testified that between two and three minutes into their conversation, Barbara said that "she needed a second, she'd be right back, hold on" without any alarm in her voice, and Barbara put the phone down. Balsick testified that Barbara never returned to the phone. Other witnesses discovered Barbara's body in the back of the store some time after 6:00 p.m., and police received a 911 call at 6:22 p.m.

or manage a store in Harrisville." The unidentified man told Olson that a "kid" sold him a box of vintage comic books for $20. After inspecting the comic books, the man concluded that they were "very valuable including one that was worth $385." The Court of Appeals erroneously concluded that this second tip sheet could have assisted the defense in countering the prosecution's claim that no armed robbery occurred at Comics Book World on the day of the murder. The tip sheet establishes that a woman spoke with an unidentified man of an undetermined profession about the man having purchased a box of underpriced comic books from a child. At best, the tip sheet offers weak speculative support for the defense theory regarding an armed robbery. However, the tip sheet provides no link whatsoever between the comic books sold in Harrisville and the robbery that allegedly occurred in Clinton Township. Additionally, one of the fundamental weaknesses in the robbery theory is defendant's own shifting stories. After telling police that $2,000 was missing from the safe and that two boxes of expensive comic books sitting on top of the safe had disappeared, defendant subsequently recanted his story about $2,000 being missing. Moreover, when the police informed defendant of a customer's statement that the customer previously purchased one of the comic books that defendant listed as stolen, defendant again recanted and claimed that the comic book in question was not one of the comic books that disappeared. Accordingly, the second tip sheet would not make a different result more probable on retrial.

The third police tip sheet describes a phone call that police received 16 days after the murder from Pat Flannery who worked with Trustee Services in the Wayne County Sheriff's Department. Flannery reported that he lived with Rita Prog, and he suspected that Rita Prog's former spouse, Marshall Prog, "could somehow be involved" in the murder. According to Flannery, Marshall Prog left his home in Florida and traveled to Michigan a few days before the murder. Flannery stated that Marshall Prog came to Michigan with nothing and that he left with a large sum of money soon after the murder. Flannery also said that when Rita and Marshall Prog were married, the couple "were friends and business acquaintances" with defendant and his wife. Any defense theory regarding Marshall Prog as a viable alternative suspect is highly attenuated. The police did not find any indication of a robbery. Further, the police discovered more than $400 in Barbara's pocket and five pieces of jewelry on her person, including a $2,500 ring. Consequently, the defense is left with the dubious theory that Marshall Prog stole two boxes of expensive comic books from Comics Book World while leaving behind large amounts of cash and jewelry, murdered the victim, fenced the comic books a few days after the crime, and then returned home to Florida. This speculative theory involving Marshall Prog simply does not establish that the third tip sheet would make a different result more probable on retrial.

## III. CONCLUSION

The jury found beyond a reasonable doubt that defendant shot his wife and fraudulently collected insurance proceeds as a result of her murder. Because none of the three newly discovered police tip sheets would make a different result probable on retrial, the decision to grant defendant a new trial apparently fails the fourth prong of *Cress*, and the trial court appears to have abused its discretion in granting defendant a new trial on the basis of newly discovered evidence. Consequently, I would grant the prosecutor's application for leave to appeal.

YOUNG, J., joins the statement of CORRIGAN, J.

MARKMAN, J. (*dissenting*).

I would grant leave to appeal to determine whether the newly discovered evidence identified in this case would, in light of the evidence summarized by Justice CORRIGAN in her dissent, "make a different result probable on retrial," *People v Cress*, 468 Mich 678, 692 (2003), and whether, if not, the trial court abused its discretion in granting a new trial based upon such evidence.



I, Corbin R. Davis, Clerk of the Michigan Supreme Court, certify that the foregoing is a true and complete copy of the order entered at the direction of the Court.

September 29, 2010

_____
Clerk