# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

TYNATHAN AMEIRE FELDER,

Defendant-Appellant.

UNPUBLISHED
March 17, 2016

No. 324621
Ingham Circuit Court
LC No. 13-000802-FC

Before: GLEICHER, P.J., and MURPHY and OWENS, JJ.

PER CURIAM.

Defendant, Tynathan Ameire Felder, appeals as of right his jury trial convictions of eight counts of first-degree criminal sexual conduct (CSC), MCL 750.520b, one count of conspiracy to commit first-degree CSC, MCL 750.157a, two counts of armed robbery, MCL 750.529, one count of first-degree home invasion, MCL 750.110a(2), and two counts of possessing a firearm during the commission of a felony (felony-firearm), MCL 750.227b. He was sentenced to concurrent terms of 225 to 450 months' imprisonment for each of the CSC, conspiracy, and armed-robbery convictions, and 95 to 240 months' imprisonment for the home-invasion conviction. He was also sentenced to consecutive terms of 24 months' imprisonment for each of the felony-firearm convictions. We affirm.

This case arises from three separate incidents where defendant and two others raped and robbed four victims, AK, AD, BC, and MC, after responding to the victims' ads on Backpage.com, which, according to the testimony, is a website on which escort service ads are commonly posted. The first incident occurred on May 23, 2013, and involved victims AK and AD. The second incident occurred on June 3, 2013, and involved victim BC.[1] The last incident occurred on June 7, 2013, and involved victim MC. The facts of each incident had striking similarities. In response to the victims' ads, defendant went to the victims' residences to trade money for sex or in MC's case money for massages. Defendant would enter alone, with the other two men following shortly after. However, in MC's case, the other two men never entered

---

[1] Defendant was charged with four other counts arising out of the incident with victim BC, which were dismissed because she failed to show up for the preliminary examination. She was, however, called to testify at trial as an other-acts witness pursuant to MRE 404(b).

her residence because they happened to be seen lurking outside by MC's cousin and fled. Once inside, defendant allegedly held a gun to the victims and forced them to perform vaginal, anal, and oral sex. With the first two incidents, the victims were forced to perform sexual acts with the other two men, as well. Before leaving the victims' residences, defendant robbed the victims. The other two men helped rob the victims during the first two incidents, as well. All of the victims called the police immediately following the assaults and were given SANE[2] examinations. When the nurse performed an exam on MC, she recognized the similarities between her case and that of the previous victims and notified the police. Tests conducted from semen swabs taken from all four victims revealed the presence of defendant's DNA. Defendant did not testify at trial, but he provided the police a written statement, in which he admitted to responding to the ads on Backpage.com and claimed that he had consensual sex with all four victims.

On appeal, defendant argues that he is entitled to a new trial based on various discovery, *Brady*,[3] and *Youngblood*[4] violations and the prosecutor's use of a peremptory challenge to remove a prospective juror solely based on race.

Defendant moved for a dismissal, or in the alternative, a mistrial based on the various alleged discovery violations, which the trial court denied. We review for an abuse of discretion a trial court's decision whether to grant or deny a motion to dismiss or a motion for a mistral based on discovery violations. MCR 6.201(J); *People v Davie (After Remand)*, 225 Mich App 592, 597-598; 571 NW2d 229 (1997).

"There is no general constitutional right to discovery in a criminal case . . . ." *Weatherford v Bursey*, 429 US 545, 559, 97 S Ct 837, 51 L Ed 2d 30 (1977). However, pursuant to *Brady*, 373 US at 87, "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." To establish a *Brady* violation, defendant must show that "(1) the prosecution has suppressed evidence; (2) that is favorable to the accused; and (3) viewed in its totality, is material." *People v Chenault*, 495 Mich 142, 155; 845 NW2d 731 (2014). When assessing whether the suppressed evidence was material, " 'The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.' " *Id.* at 157, quoting *Kyles v Whitley*, 514 US 419, 434; 115 S Ct 1555; 131 L Ed 2d 490 (1995).

In contrast, when the government fails to preserve potentially useful or exculpatory evidence, a criminal defendant must show bad faith on the part of the police. *Youngblood*, 488 US at 58.

---

[2] Sexual Assault Nurse Examiner

[3] *Brady v Maryland*, 373 US 83; 83 S Ct 1194; 10 L Ed 2d 215 (1963).

[4] *Arizona v Youngblood*, 488 US 51; 109 S Ct 333; 102 L Ed 2d 281 (1988).

We think that requiring a defendant to show bad faith on the part of the police both limits the extent of the police's obligation to preserve evidence to reasonable bounds and confines it to that class of cases where the interests of justice most clearly require it, i.e., those cases in which the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant. [*Id.*]

Thus, a finding of bad faith rests on whether the police knew of the evidence's apparent exculpatory value at the time the evidence was lost or destroyed. *Id.* at 56. Further, it should be noted that police are not under a duty to seek and discover exculpatory evidence. *People v Sawyer*, 222 Mich App 1, 6; 564 NW2d 62 (1997).

Additionally, MCR 6.201 governs discovery in criminal cases, and provides in part,

**(A) Mandatory Disclosure.** In addition to disclosures required by provisions of law other than MCL 767.94a, a party upon request must provide all other parties:

(1) the names and addresses of all lay and expert witnesses whom the party may call at trial; in the alternative, a party may provide the name of the witness and make the witness available to the other party for interview; the witness list may be amended without leave of the court no later than 28 days before trial;

(2) any written or recorded statement, including electronically recorded statements, pertaining to the case by a lay witness whom the party may call at trial, except that a defendant is not obliged to provide the defendant's own statement;

(3) the curriculum vitae of an expert the party may call at trial and either a report by the expert or a written description of the substance of the proposed testimony of the expert, the expert's opinion, and the underlying basis of that opinion;

(4) any criminal record that the party may use at trial to impeach a witness;

(5) a description or list of criminal convictions, known to the defense attorney or prosecuting attorney, of any witness whom the party may call at trial; and

(6) a description of and an opportunity to inspect any tangible physical evidence that the party may introduce at trial, including any document, photograph, or other paper, with copies to be provided on request. A party may request a hearing regarding any question of costs of reproduction, including the cost of providing copies of electronically recorded statements. On good cause shown, the court may order that a party be given the opportunity to test without destruction any tangible physical evidence.

**(B) Discovery of Information Known to the Prosecuting Attorney.**
Upon request, the prosecuting attorney must provide each defendant:

> (1) any exculpatory information or evidence known to the prosecuting attorney;

> (2) any police report and interrogation records concerning the case, except so much of a report as concerns a continuing investigation;

> (3) any written or recorded statements, including electronically recorded statements, by a defendant, codefendant, or accomplice pertaining to the case, even if that person is not a prospective witness at trial;

> (4) any affidavit, warrant, and return pertaining to a search or seizure in connection with the case; and

> (5) any plea agreement, grant of immunity, or other agreement for testimony in connection with the case.

Additionally, the parties have a continuing duty to promptly notify the other party if they discover additional information subject to disclosure under MCR 6.201. MCR 6.201(H). It is within the trial court's discretion to decide the appropriate remedy for violating the discovery rule. MCR 6.201(J). "When determining the appropriate remedy for discovery violations, the trial court must balance the interests of the courts, the public, and the parties in light of all the relevant circumstances, including the reasons for noncompliance." *People v Banks*, 249 Mich App 247, 252; 642 NW2d 351 (2002). Further, the complaining party must show that the discovery violation caused him or her actual prejudice. *Davie (After Remand)*, 225 Mich App at 598.

First, defendant argues that the prosecutor violated MCR 6.201(A)(2) by untimely disclosing a recorded video statement of AK. The video was an initial interview with AK, who later admitted in subsequent interviews that she lied to the police initially on how she met defendant because she did not want to get in trouble for engaging in prostitution. Although the video should have been turned over to defendant when he made his initial discovery request, defendant has not shown actual prejudice where the police report contained a two-page summary of the interview and defendant has not alleged how the video differed from the summary. *Davie (After Remand)*, 225 Mich App at 598. Additionally, the prosecutor was unaware that the video existed and the reason for noncompliance is a relevant consideration in determining an appropriate remedy. *Banks*, 249 Mich App at 252.

Defendant also argues that this late disclosure violates *Brady* because defendant would have posed different questions during jury selection had he known about the video. Defendant, however, has not shown how the video was material to his defense. He does not dispute that he received a police report containing a summary of the interview. Further, AK testified that she lied during her initial interview to the police. Defendant has not pointed to any evidence in the video that was not included in the police report or that would have undermined confidence in the verdict. *Chenault*, 495 Mich at 157.

-4-

Next, defendant argues that the government violated *Brady* by failing to preserve the video-recorded statement of AD taken in the squad car while the responding officer was speaking with AD. Defendant argues that this information would show that AD lied during her initial interview as to how she met defendant. While it was clearly negligent for the police to fail to preserve the in-car video, defendant has not shown how this video was material. Defendant does not dispute the fact that he received a police report, which contained a summary of the conversation. AD also testified that she deliberately lied to the responding officer during their conversation in the squad car as to how she met defendant to cover up the fact that she was engaging in prostitution, which is what defendant wanted to use the in-car video to prove. The failure to preserve the video did not undermine confidence in the verdict. *Chenault*, 495 Mich at 157.[5]

Next, defendant takes issue with the fact that AK's cell phone was returned before the data was removed. Defendant does not cite specific case law supporting his argument, but given that he argues the cell phone had a potential for exculpatory evidence, it appears he is asserting a *Youngblood* violation. Specifically, defendant argues that the cell phone contains exculpatory evidence in that it cuts against AK's credibility because she testified that she ran to a neighbor's house to call the police when she allegedly had the cell phone in her possession. *Youngblood* makes clear that a finding of bad faith rests on whether the police knew of the evidence's apparent exculpatory value at the time the evidence was lost or destroyed. *Youngblood*, 488 US at 56. The lead detective testified that she did not feel the cell phone had any useful evidence on it, other than testing for fingerprints, which was done. Defendant makes no argument regarding what the cell phone might have contained that would have been exculpatory, and police are not under a duty to seek out exculpatory evidence. *Sawyer*, 222 Mich App at 6. Finally, the jury heard from the responding officer that the cell phone was found in the living room, which could support defendant's argument that AK's credibility was affected for not using a cell phone in her possession to call the police. Therefore, the return of the cell phone before removing the data did not undermine confidence in the verdict. *Chenault*, 495 Mich at 157.

Next, defendant seems to suggest that the prosecutor violated *Brady* by suppressing evidence of heroin found at BC's home. The prosecutor contends that the first time the government heard of the heroin was when BC testified. This is supported by the police reports, which contain no reference to heroin. On appeal, defendant seems to suggest that the police intentionally suppressed the heroin and that is why there is no mention of heroin in the police reports. This is nothing more than an unsupported accusation, however, and defendant does not argue how the alleged failure to disclose this information undermined confidence in the verdict

---

[5] Contrary to defendant's argument, the destruction of evidence falls within *Youngblood*, not *Brady*. As a result, defendant would be required to show bad faith on the part of the police, *Youngblood*, 488 US at 58, and here, the facts show nothing more than negligence. Generally, evidence that has been routinely destroyed pursuant to a departmental policy does not establish that the police acted in bad faith. *People v Petrella*, 124 Mich App 745, 753; 336 NW2d 761 (1983). In this case, the in-car video was automatically deleted after 120 days because it was not tagged for preservation. The routine deletion of the video does not amount to bad faith.

as to violate *Brady*. We will not discover and rationalize the basis for an appellant's claims. *People v Kelly*, 231 Mich App 627, 640-641; 588 NW2d 480 (1998). Additionally, it was clear from BC's testimony that she was a very difficult witness and unstable. Although she denied being under the influence when the trial court asked, her instability as a witness indicates that she might have been. The jury was free to give her testimony the weight and credibility it saw fit. See *People v Kanaan*, 278 Mich App 594, 619; 751 NW2d 57 (2008) ("This Court will not interfere with the trier of fact's role of determining the weight of the evidence or the credibility of witnesses.").

Next, defendant argues that the prosecutor violated the discovery rule by failing to disclose the alleged photographic lineup conducted with BC in which she identified defendant. At trial, BC testified that the lead detective came to her house and showed her a line-up in which she identified defendant. The detective, however, testified that she only showed BC a line-up of one of the codefendants, Elbert Pope. The prosecution stated this, as well. The next day of trial, defense counsel showed BC some photographs that may have been shown to her by the detective in the alleged lineup containing defendant and BC was unable to recall seeing any of the photographs previously, particularly one of defendant. On this record, we cannot conclude that BC was shown a photographic lineup, particularly where at trial BC was unable to recall any photographs shown to her and where her testimony indicates that she was an unstable witness.[6]

Next, defendant argues that the prosecutor violated MCR 6.201(A)(2) by failing to disclose supplemental reports regarding statements made by BC when the lead detective and the prosecutor visited her house. Defendant specifically references BC's testimony in which she stated that the police and "her attorney," which seems to indicate the prosecutor, came to her house to interview her. The prosecutor contends that the detective did not write any supplemental reports, so there was nothing to disclose.

Even if this Court were to assume that the reports existed and the prosecutor failed to disclose them to defense counsel in violation of MCR 6.201(A)(2), the trial court still had

---

[6] Defendant also makes an unsupported assertion on appeal that the error in failing to disclose the photographic lineup violates *United States v Wade*, 388 US 218; 87 S Ct 1926; 18 L Ed 2d 1149 (1967), and that he was entitled to *Wade* hearing. In order to sustain a due process challenge under *Wade*, "a defendant must show that the pretrial identification procedure was so suggestive in light of the totality of the circumstances that it led to a substantial likelihood of misidentification." *People v Kurylczyk*, 443 Mich 289, 302-303; 505 NW2d 528 (1993). If the pretrial lineup was impermissibly suggestive, then testimony concerning the identification is inadmissible. *Id.* at 303. Notably, the prosecutor was not trying to introduce evidence concerning BC's identification of defendant through a photographic lineup. BC merely testified on cross-examination that she was shown one, which came as a surprise to the prosecutor. Further, defendant provides no evidence that the photographic lineup was unduly suggestive, and as the prosecutor points out on appeal, defendant's identity was not at issue where he admitted to having sex with BC that evening, but claimed it was consensual and where DNA tests revealed that the semen found on BC belonged to defendant.

discretion to fashion a remedy for violating the rule, and defendant has not shown how a mistrial was warranted under these circumstances. Had defense counsel known before trial that BC was mistaken about seeing defendant two days before the incident, there is nothing more he could have done than cross-examine her about it, which is what he did at trial. The mistake or "lie," as defendant classifies it, was made known to the jury and it was free to give BC's testimony the weight and credibility it saw fit. Defendant has not shown actual prejudice from the alleged nondisclosure of the reports. *Davie (After Remand)*, 225 Mich App at 598.

Next, defendant argues that the late disclosure of the latent fingerprint report violated discovery. The report, which was prepared after the trial started, revealed matches between fingerprints found at AK and AD's home and defendant's fingerprints. Other than to state that he would have asked different questions during voir dire and of the initial witnesses, defendant does not explain how the late disclosure of the report caused him actual prejudice, *Davie (After Remand)*, 225 Mich App at 598, particularly where defense counsel stipulated to its admission, defendant told the police that he was with the victims, and semen swabs taken from the victims revealed the presence of defendant's DNA. Further, as discussed, when fashioning a remedy for discovery violations, the trial court is to consider the reasons for noncompliance. *Banks*, 249 Mich App at 252. Ken Lucas, who prepared the report, testified that it was an inadvertent mistake that he never ran a comparison with defendant's fingerprints when he initially analyzed the fingerprints, and he did not discover the mistake until he was preparing to testify at the trial, upon which he prepared the report and turned it over to the prosecution, who immediately provided defense counsel a copy.

Next, defendant argues that the prosecutor violated discovery by failing to disclose a supplemental report dated July 23, 2013, in which BC gave the police serial numbers of her stolen items, including a tablet. On appeal, plaintiff seems to agree that this is a clear violation of MCR 6.201. Nevertheless, defendant does not explain how this caused him actual prejudice. *Davie (After Remand)*, 225 Mich App at 598. The serial numbers were not necessary to link the tablet recovered at defendant's residence to the one stolen from BC. BC reported her tablet missing and a list of items recovered from defendant's residence, including a tablet, was given to the defense. BC was able to identify the tablet recovered at defendant's residence as hers because she recognized a crack in the screen, and it contained multiple photos and videos that she took. Defendant was free to examine this tablet before trial. The supplemental report only provided the serial number for the tablet, and defendant has not shown how this inculpatory evidence would have changed the outcome of the trial or how failure to disclose it warranted a new trial.

Next, defendant argues that the prosecutor violated MCR 6.201(B)(5) by failing to disclose the prosecutor's agreement not to prosecute the witnesses for prostitution. There is no evidence, however, that the prosecutor made such agreements with the witnesses. Defendant merely claims that because the witnesses engaged in acts that would subject them to criminal prosecution, then immunity agreements must exist. This unsupported assertion does not violate MCR 6.201(B)(5).

Next, defendant asserts a *Brady* violation where the prosecutor did not disclose to defense counsel that MC's children were outside the house at the time the incident occurred and were present at her mother's house where MC went after the incident. Defendant argues that this

affects MC's credibility, but does not explain how not having this information before trial undermines confidence in the verdict. *Chenault*, 495 Mich at 157. At trial, MC originally testified that the only people present after the incident occurred where her mother and her cousin. The prosecutor informed the trial court that this testimony was perjured because her children were also there. Defense counsel was permitted to cross-examine MC, and she admitted that her children were in fact present outside during the incident. The jury was clearly aware from her testimony that MC originally lied regarding the presence of her children, which affects her credibility. Defendant has not explained how having this information before trial would have affected her credibility any differently than MC's testimony revealing her lie may have.

Next, defendant argues that he is entitled to a new trial because the prosecutor failed to inform the defense that MC had two convictions for a theft crime, rather than only one. He asserts that two convictions involving dishonesty establishes a pattern of conduct. It is unclear why the second conviction was not disclosed to defendant, which is a violation of MCR 6.201. However, this discovery violation did not cause defendant actual prejudice. *Davie (After Remand)*, 225 Mich App at 598. It is unlikely that the outcome of the trial would have been different had defendant been able to impeach only one of the multiple complainants based on an additional theft conviction. Defendant's convictions were based on three separate incidents with multiple complainants, which had striking similarities—enough that the SANE examiner recognized the similarities, and his DNA was found in semen collected from all four victims. Therefore, defendant has not shown how this discovery violation warrants a new trial.

Next, defendant argues that the prosecutor violated discovery by untimely disclosing a petition and order for access to defendant's phone records, which were never obtained. MCR 6.201(B)(4) provides that the prosecutor must disclose "any affidavit, warrant, and return pertaining to a search or seizure in connection with the case." Because the "search" was never conducted of defendant's phone records, the petition and order is not something that prosecutor was required to disclose. Even if this Court were to assume the prosecutor was required to disclose the petition and order, defendant has failed to show how the discovery violation caused him actual prejudice, *Davie (After Remand)*, 225 Mich App at 598, or explain how this might violate *Brady*. As plaintiff points out, defendant could have obtained a copy of his own phone records if he thought they would assist in his defense, and he does not explain exactly how the records would have been used to challenge the factual allegations in the case. Further, defendant has not explained how a new trial is warranted where the prosecutor learned of the petition and order during trial and promptly disclosed it. *Banks*, 249 Mich App at 252.

Finally, defendant argues that the prosecutor failed to disclose a supplemental report, which stated that MC called the lead detective to inform her that she saw a photograph of the assailant in the newspaper. However, there is no indication that the detective wrote a supplemental report, and plaintiff contends that the detective did not write one. If no report existed, there can be no violation of MCR 6.201(A)(2). And if this Court were to assume the report existed and it was not disclosed, defendant has failed to show actual prejudice. *Davie (After Remand)*, 225 Mich App at 598. Again, defendant's identity was not at issue where he admitted to being with the victim and his DNA was found in semen taken from the victim.

-8-

We conclude that while there were some discovery violations that occurred in this case, they did not cause defendant actual prejudice, *Davie (After Remand)*, 225 Mich App at 598, or undermine confidence in the verdict. *Chenault*, 495 Mich at 157.

Defendant next argues that given the discovery violations, at the very least, he was entitled to a spoliation instruction, commonly referred as an adverse-inference instruction in a criminal case. Generally, we review de novo claims of instructional error, but we review for an abuse of discretion a trial court's determination whether a jury instruction is applicable to the facts of the case. *People v Dobek*, 274 Mich App 58, 82; 732 NW2d 546 (2007).

The trial court did not abuse its discretion in failing to give an adverse inference instruction because it was not applicable to the facts of the case. In asserting the various discovery, *Brady*, and *Youngblood* violations, defendant was required to make a showing that the violations undermined confidence in the verdict or caused him actual prejudice, or that the police acted in bad faith. Because defendant failed to do so, he is not entitled to the instruction. See *People v Davis*, 199 Mich App 502, 515; 503 NW2d 457 (1993) (holding that the trial court did not err in failing to give an adverse inference instruction because the defendant did not show that the prosecutor acted in bad faith in failing to produce evidence, which the defendant was required to do in that case).

Finally, defendant argues that the prosecutor used a peremptory challenge to remove a prospective juror solely based on race.[7] The Equal Protection Clause of the Fourteenth Amendment prohibits the prosecution from exercising a peremptory challenge to remove a prospective juror based solely on race. *Batson v Kentucky*, 476 US 79, 86-87; 106 S Ct 1712; 90 L Ed 2d 69 (1986). In *Batson*, the United States Supreme Court announced a three-step process for determining the merits of a *Batson* challenge. *Id.* at 96-98. A defendant challenging a peremptory dismissal must first make a prima facie showing of discrimination. *Id.* at 96. To do so, the defendant must show that (1) he is a member of a cognizable racial group, (2) the prosecutor has exercised a peremptory challenge to exclude a member of defendant's race from the jury pool, and (3) all of the relevant circumstances raise an inference that the prosecutor used the peremptory challenge to exclude the prospective juror based on race. *Id.* Once a defendant makes a prima facie showing of discrimination, the burden shifts to the prosecutor to articulate a race-neutral explanation for the peremptory challenge. *Id.* at 97. The third, and final step, requires the trial court to determine whether the defendant has proved purposeful discrimination. *Id.* at 98.

In this case, when defendant accused the prosecutor of using a peremptory challenge to remove the prospective juror solely based on race, the prosecutor responded with a race-neutral

---

[7] Although defendant argued at trial that there was an underrepresentation of African-American jurors in the jury pool, he does not raise this argument on appeal. The question presented only addresses the prosecutor's use of a peremptory challenge to excuse a juror based on race. Defendant states in the brief that he is entitled to relief based on the systematic exclusion of a cognizable racial group in the venire, but defendant does not expound on this argument. Rather, defendant focuses on the *Batson* challenge raised at trial.

explanation and defended his use of the peremptory challenge without any prompting or inquiry from the trial court. "Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot." *Hernandez v New York*, 500 US 352, 359; 111 S Ct 1859; 114 L Ed 2d 395 (1991). Therefore, it is not necessary for us to determine whether defendant established a prima facie case of discrimination. Rather, we will review de novo the trial court's determination whether the prosecutor offered a race-neutral explanation for the peremptory challenge and for clear error whether the proffered explanation is a pretext for actual discriminatory intent. *People v Knight*, 473 Mich 324, 343-344; 701 NW2d 715 (2005).

A race-neutral explanation is simply an explanation based on something other than the race of the juror. *Hernandez*, 500 US at 360. "Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Id.* In this case, the prosecutor offered a race-neutral explanation when he explained that he used the peremptory challenge based on the prospective juror's initial reactions to his questions where the prospective juror stated that he did not believe he could put his past negative experiences with police officers aside and be fair and impartial. The explanation is based on bias, i.e., something other than race, and does not violate the Equal Protection Clause as a matter of law. *Knight*, 473 Mich at 344.

When reviewing whether the proffered explanation is merely a pretext for actual discriminatory intent, we give "great deference on appeal" to the trial court's decision regarding discriminatory intent because the decision relies heavily on credibility and whether the prosecutor's race-neutral explanation should be believed. *Hernandez*, 500 US at 364-365, citing *Batson*, 476 US at 98. See also *Knight*, 473 Mich at 344 (stating that "assessment of credibility lies within the trial court's province").

In this case, we conclude that the trial court did not clearly err by determining that the peremptory challenge was reasonably based on bias and not on race. Based on the prospective juror's responses to the prosecutor's questions, it was acceptable for the prosecutor to have legitimate concerns whether the prospective juror could be fair and impartial. The prospective juror showed a bias against police officers and believed that all police officers could be prejudiced, regardless of their race. The prospective juror told the prosecutor that he did not think he should be on the jury because he might have a hard time being fair and impartial, especially concerning the police. It took continued questioning from the trial court to get the prospective juror state that he could in fact be fair and impartial, but the line of questioning was rather persistent. Therefore, it would be reasonable for the prosecutor to have legitimate concerns even after the trial court's questions, and defendant has not satisfied the ultimate burden of proving purposeful discrimination. *Batson*, 476 US at 98.

Affirmed.


/s/ Elizabeth L. Gleicher
/s/ William B. Murphy
/s/ Donald S. Owens