# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v

TIMOTHY LEON TERRY,

      Defendant-Appellant.

UNPUBLISHED
January 16, 2018

No. 334401
Wayne Circuit Court
LC No. 16-002260-01-FC

Before: TALBOT, C.J., and MURRAY and O'BRIEN, JJ.

PER CURIAM.

Timothy Leon Terry was charged with first-degree premeditated murder,[1] being a felon in possession of a firearm (felon-in-possession),[2] and possession of a firearm during commission of a felony (felony-firearm).[3] A jury convicted him of the lesser offense of second-degree murder,[4] as well as the two firearm offenses. The trial court sentenced Terry as a fourth-offense habitual offender[5] to concurrent prison terms of 40 to 80 years for the second-degree murder conviction and 40 to 60 months for the felon-in-possession conviction, to be served consecutive to a two-year term of imprisonment for the felony-firearm conviction. Terry appeals as of right, and we affirm.

## I. FACTS AND PROCEEDINGS

Terry's convictions arise from the fatal shooting of Rehk Imhotep, who was shot while inside his truck in a Home Depot parking lot in Detroit on October 12, 2015.

---

[1] MCL 750.316(1)(a).

[2] MCL 750.224f.

[3] MCL 750.227b.

[4] MCL 750.317.

[5] MCL 769.12.

Terry was involved in the business of buying vacant homes in Detroit, refurbishing them, and selling them at a profit. Imhotep came to Detroit from North Carolina in 2014 to pursue opportunities in the Detroit real estate market. He and Terry frequently worked together, but their business relationship had soured by September 2015. On October 12, 2015, Terry and Imhotep met by chance in the parking lot of the Home Depot on Meyers Street in Detroit. As Imhotep was driving out of the parking lot, with Terry following him, they argued briefly from their respective vehicles, and Terry shot and killed Imhotep. Afterward, Terry left his vehicle behind a friend's house and departed for Ohio.

Much of the altercation between Terry and Imhotep was recorded by surveillance video cameras at the Home Depot store. Detroit Police Sergeant Lance Sullivan extracted the video recordings from the surveillance cameras and made a compilation video from the different camera views. The recordings showed Imhotep inside the store, exiting the store, traversing the parking lot, and then driving his vehicle onto Meyers Street after he was shot. However, the recording did not show Terry and Imhotep confronting each other or the area where the shooting occurred. According to Sullivan, he examined the video recordings from all of the different cameras on the Home Depot surveillance system and determined that the shooting occurred in an area of the parking lot that was not covered by any of the cameras. Accordingly, no recording existed that showed the actual shooting. However, witnesses at trial testified that they heard gunshots and one witness identified Terry as the shooter.

At trial, Terry testified that he saw Imhotep at the Home Depot store and tried to stop him to inquire about some work materials for an unfinished project. According to Terry, Imhotep fired a gun at him, so Terry shot Imhotep in self-defense. Terry admitted that he was not legally permitted to possess a firearm, but said he did so for protection because he often worked in vacant houses in dangerous neighborhoods. A significant weakness in Terry's self-defense theory was that a gun was not recovered from the crime scene. However, Terry offered evidence that he had previously given Imhotep a .40 caliber semiautomatic handgun for protection, and witnesses testified that Imhotep often brought the gun to worksites. The police recovered two .45 caliber shell casings from the crime scene, consistent with Terry's gun, and also found a .40 caliber shell casing on Meyers Street, approximately 100 feet from the two .45 caliber casings. Defense counsel also established that there was an approximate six-minute window after Imhotep was shot before the police arrived to secure the area, and argued that Imhotep's gun was likely stolen by one of the bystanders who approached Imhotep's truck after the shooting.

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

Terry argues on appeal that defense counsel committed several errors at trial that deprived him of the effective assistance of counsel. Terry did not raise these claims in a motion for a new trial or request for a *Ginther*[6] hearing, and this Court denied Terry's motion to

---

[6] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

remand.[7] Therefore, our review of this issue "is limited to mistakes apparent on the lower court record."[8] "Whether a defendant has been denied the effective assistance of counsel is a mixed question of fact and constitutional law."[9] "To prevail on a claim of ineffective assistance of counsel, a defendant bears a heavy burden to establish that (1) counsel's performance was deficient, meaning that it fell below an objective standard of reasonableness, and (2) but for counsel's error, there is a reasonable probability that the outcome of the defendant's trial would have been different."[10]

## A. CHOICE OF DEFENSE THEORY

Terry principally argues that defense counsel unreasonably chose to pursue a weak self-defense theory that was based on the notion that Imhotep displayed and fired a gun when Terry confronted him at the Home Depot store. Terry argues that this choice of defense fell below an objective standard of reasonableness because there was scant evidence that Imhotep actually possessed a gun during the incident, and no evidence to explain why a gun was not recovered from the crime scene. Terry argues that any inference that a gun was taken from Imhotep's truck before the police arrived implausibly assumed that prosecution witnesses lied when they denied seeing a gun in the truck and that an unknown person stole a gun that was connected to a homicide. Terry argues that it would have been more reasonable for defense counsel to rely on other evidence presented at trial—namely, that a bullet-damaged cell phone was found in Imhotep's possession and that a witness heard the sound of a bottle breaking just before the shooting—to instead present a more persuasive self-defense theory that Terry mistakenly believed that the sound of a bottle breaking was a gunshot and that the cell phone in Imhotep's hand was a gun.

A defense attorney's decision to argue one defense over another is generally considered a matter of trial strategy.[11] Similarly, "[d]ecisions regarding what evidence to present and whether to call or question witnesses are presumed to be matters of trial strategy . . . ."[12] "[T]his Court will not substitute its judgment for that of counsel regarding matters of trial strategy."[13] "A particular strategy does not constitute ineffective assistance of counsel simply because it does not work."[14] A trial attorney's alleged failure to adequately investigate and present a defense does

---

[7] *People v Terry*, unpublished order of the Court of Appeals, entered January 24, 2017 (Docket No. 334401); *People v Terry*, unpublished order of the Court of Appeals, entered April 18, 2017 (Docket No. 334401).

[8] *People v Solloway*, 316 Mich App 174, 188; 891 NW2d 255 (2016).

[9] *Id*. at 187.

[10] *Id*. at 188.

[11] See *People v LaVearn*, 448 Mich 207, 215-216; 528 NW2d 721 (1995).

[12] *People v Davis*, 250 Mich App 357, 368; 649 NW2d 94 (2002).

[13] *Id*.

[14] *People v Matuszak*, 263 Mich App 42, 61; 687 NW2d 342 (2004).

not constitute ineffective assistance unless it deprives the defendant of a substantial defense.[15] "A substantial defense is one that might have made a difference in the outcome of the trial."[16]

The Self-Defense Act, MCL 780.971 *et seq.*, provides, in pertinent part:

> (1) An individual who has not or is not engaged in the commission of a crime at the time he or she uses deadly force may use deadly force against another individual anywhere he or she has the legal right to be with no duty to retreat if either of the following applies:

> (a) The individual honestly and reasonably believes that the use of deadly force is necessary to prevent the imminent death of or imminent great bodily harm to himself or herself or to another individual.[17]

The common-law defense also requires an honest and reasonable belief that deadly force is necessary to prevent imminent death or imminent great bodily harm.[18] Michigan's model jury instruction on self-defense[19] likewise recognizes that self-defense does not require proof of an actual threat of death or serious physical injury. It is a long-standing principle that the defense is valid if the defendant reasonably believes that death or serious injury is imminent, even if that belief is later shown to have been mistaken.[20]

Terry correctly asserts that a self-defense theory did not require proof that Imhotep was actually armed with a dangerous weapon. He correctly states that defense counsel could have presented a theory that Terry reasonably, but mistakenly, believed that Imhotep's cell phone was a gun and that the sound of a glass bottle breaking was gunfire. However, the choice between a defense theory based on Imhotep's actual display of a gun or Terry's mistaken perception of a gun was clearly a matter of strategy. Terry's post-trial, hindsight assessment of the comparative advantages and disadvantages of the two-gun theory versus a mistaken-belief theory is at best debatable. Terry argues that the chosen two-gun theory was unreasonable because it created the additional and unnecessary burden of demonstrating that Imhotep actually possessed a gun that was never recovered from the crime scene, which required counsel to rely on the implausible theory that the gun was taken from the scene during the brief period between the shooting and the arrival of the police. While this theory, admittedly, had its weaknesses, so too did Terry's alternative mistaken-belief theory. The decision to employ one of two possible defense

---

[15] *People v Russell*, 297 Mich App 707, 716; 825 NW2d 623 (2012).

[16] *People v Chapo*, 283 Mich App 360, 371; 770 NW2d 68 (2009) (quotation marks and citation omitted).

[17] MCL 780.972.

[18] *People v Guajardo*, 300 Mich App 26, 35; 832 NW2d 409 (2013).

[19] M Crim JI 7.15.

[20] *Pond v People*, 8 Mich 150, 169 (1860).

strategies, neither of which is without problems, does not constitute ineffective assistance of counsel.[21]

With respect to the two-gun theory, defense counsel elicited testimony that Terry gave Imhotep a gun. Other witnesses testified that Imhotep routinely carried the gun. Counsel established that none of Imhotep's family members or acquaintances came forward with a gun after the shooting, thereby negating the inference that Imhotep might not have had it with him on October 12. The weakness in this theory was that a gun was not found at the crime scene. But counsel established at trial that there was an approximate six-minute time period after the shooting before the police arrived and secured the scene. Counsel used this gap to argue that it was possible that someone seized an opportunity to take the gun before the police arrived. Defense counsel also highlighted the evidence that a .40 caliber shell casing was found near the crime scene, and the testimony that Terry gave Imhotep a .40 caliber gun to carry for protection before the shooting.

With the benefit of hindsight, Terry argues that defense counsel should have presented the alternative theory that, although Imhotep did not possess a gun, Terry reasonably mistook Imhotep's cell phone for a gun and reasonably mistook the sound of a breaking bottle for gunfire. However, that theory also had its weaknesses. Principally, its success depended on the jury believing that Terry perceived Imhotep as a threat and was anticipating that Imhotep would act in a threatening manner when Terry approached him. Without evidence that Terry viewed Imhotep as a threat and was anticipating trouble when he approached Imhotep in the Home Depot parking lot, it would be difficult for Terry to maintain that he reasonably and honestly mistook a cell phone for a gun and the sound of a bottle breaking for gunfire so as to cause him to mistakenly believe that Imhotep was shooting at him. Although Terry testified that his and Imhotep's business relationship had soured, he never claimed that Imhotep had threatened him. The plausibility of a mistaken-belief theory was also reduced by the fact that Terry claimed that he came upon Imhotep during a chance encounter at the Home Depot store, and by the fact that it was Terry who decided to confront Imhotep. The fact that Imhotep was not expecting to see him weakened any suggestion that Terry had a reason to expect that Imhotep was prepared to act in a threating or violent manner, and Terry's decision to go after Imhotep also weakened his ability to claim that he was in fear of Imhotep such that he would be inclined to reasonably and honestly mistake innocent conduct for a threat to his immediate safety.

Most significantly, Terry unequivocally testified at trial that Imhotep fired a gun at him in the Home Depot parking lot. Defense counsel was ethically prohibited from allowing Terry to present testimony known to be false.[22] Terry does not claim that he informed defense counsel that Imhotep never actually fired a gun, or that counsel advised him to lie about Imhotep actually firing a gun.[23] In light of Terry's unequivocal testimony that Imhotep actually fired a gun, it was

---

[21] *LaVearn*, 448 Mich at 216.

[22] *Id*. at 217.

[23] In an affidavit submitted in support of his motion to remand, Terry averred that defense counsel never asked him if he might have mistaken the cell phone for a gun, or might have

reasonable for defense counsel to pursue a strategy based on corroborating that claim. Counsel did so by eliciting and highlighting evidence that Terry had previously given Imhotep a .40 caliber gun for protection; that Imhotep regularly carried a gun to worksites for protection; that a .40 caliber shell casing was found near the crime scene; and that, although no gun was recovered, there was a window of opportunity where a bystander could have removed a gun from the scene. And in light of Terry's unequivocal testimony that Imhotep actually fired a gun, it was not unreasonable for counsel to refrain from presenting an argument based on the theory that, although Imhotep did not actually possess a gun, Terry reasonably believed that he did so and had fired a gunshot. Under these circumstances, defense counsel's decision to argue the inferences in support of a two-gun theory, rather than a mistaken-belief theory, was not objectively unreasonable. Indeed, in order to credit Terry's claim of ineffective assistance of counsel, this Court would be required to find that Terry perjured himself at trial when he testified that Imhotep actually fired a gun, without any basis in the record for concluding that defense counsel suborned that perjury.

Terry also complains that defense counsel made a weak argument that the jury should doubt a police officer's testimony that gunshot residue testing is obsolete, and that such testing could have proved that Imhotep fired a gun. Counsel's presentation of that argument does not rise to the level of objectively unreasonable performance. Moreover, there is no basis for concluding that the outcome of trial was affected by this argument. At worst, the jury would have concluded that the failure to conduct a gunshot residue test was not a reason for faulting the adequacy of the police investigation. The argument did not otherwise add to or detract from the theory of self-defense that was presented at trial.

Terry's suggestion that defense counsel unreasonably remarked that it was "ridiculous" to place the burden of disproving self-defense on the prosecution is without merit. When responding to an argument by the prosecutor, defense counsel rhetorically asked, "How ridiculous is it when you stop to think the prosecutor once self defense is asserted has to prove that defendant did not act in self defense . . . ." Viewed in context, defense counsel did not argue that it was "ridiculous" to impose on the prosecutor the burden of proving that Terry did not act in self-defense.

We also reject Terry's argument that trial counsel unreasonably and "self-destructively" attacked the credibility of two prosecution witnesses, Briana Coker and Kennesha Barreiro. Counsel's decisions regarding the questioning of witnesses are presumed to be matters of trial strategy.[24] Barreiro was Imhotep's girlfriend and she denied that she ever saw Imhotep with a gun. Because this contradicted the defense theory, it was not unreasonable to challenge her credibility. With respect to Coker, Terry argues that it was unreasonable to attack her credibility because her testimony stating that she saw "[t]wo cars side by side and guns out the window" actually favored the defense. However, this statement did not clearly indicate that she saw

---

mistaken the sound of a bottle breaking for a gunshot. However, Terry did not aver that his trial testimony that Imhotep actually fired a gun was false.

[24] *Davis*, 250 Mich App at 368.

Imhotep with a gun and her subsequent testimony unambiguously referred to a single gun, wielded by Terry. Terry has not overcome the presumption that counsel's decision to challenge her credibility was objectively reasonable. Additionally, although defense counsel confused Barreiro's name for Coker's name at one point during closing argument, the jury would have understood from the substance of counsel's argument that counsel was referring to Coker.

## B. THE FELON-IN-POSSESSION CHARGE

Terry argues that defense counsel knew that he would testify that he kept a gun in his truck for safety and fired the gun in self-defense, and counsel was ineffective for not having him plead guilty to the charge of felon in possession of a firearm before trial. Terry argues that he was prejudiced by proceeding to trial on the felon-in-possession charge because it allowed the jury to learn his status as a convicted felon, which the jury would not have known about if he had pleaded guilty to that charge. The record does not support this argument. At trial, defense counsel introduced Terry's past history with the criminal justice system to explain Terry's decision not to report his claim of self-defense to the police, and to instead go to Ohio after the shooting, to refute the inference that Terry's failure to report the matter and his flight to Ohio reflected consciousness of guilt. Terry explained that he had previously been to prison and that the police had lied when he dealt with them in that matter, so he did not go to the police to tell them what had happened and he instead went to Ohio to stay with a friend. It was reasonable for defense counsel to assume that the prosecutor would cross-examine Terry on these subjects to challenge the credibility of his self-defense claim, and counsel's decision to elicit this evidence preemptively was not objectively unreasonable. In light of this record, Terry has not overcome the presumption that submitting the felon-in-possession charge to the jury, along with the other charges, was sound trial strategy.

## C. FAILURE TO OBJECT TO HEARSAY

Terry argues that defense counsel was ineffective for failing to object to information that records obtained from the Bureau of Alcohol, Tobacco, and Firearms (ATF) indicated that Terry's firearm was unregistered. Terry contends that counsel should have objected to this evidence as inadmissible hearsay, and he was prejudiced by the evidence because it allowed the jury to infer that his firearm was stolen.

"Under MRE 801(c), 'hearsay' is defined as 'a statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.' "[25] "Hearsay evidence is inadmissible unless it falls within one of the exceptions listed in the Michigan Rules of Evidence."[26] MRE 803(6) and (8) provide the following exceptions to the exclusion of hearsay:

---

[25] *Solloway*, 316 Mich App at 198-199.

[26] *Id*. at 199. See also MRE 802.

**(6) Records of Regularly Conducted Activity.** A memorandum, report, record, or data compilation, in any form, of acts, transactions, occurrences, events, . . . made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodial or other qualified witness . . . .

\* \* \*

**(8) Public Records and Reports.** Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (A) the activities of the office or agency, or (B) matters observed pursuant to duty imposed by law as to which matters there was a duty to report, excluding, however, in criminal cases matters observed by police officers and other law enforcement personnel, and subject to the limitations of MCL 257.624.

It is unclear from the record whether the ATF records would qualify under these exceptions. But to the extent that an appropriate foundation was lacking, defense counsel may have believed that the prosecutor would be able to establish a sufficient foundation to satisfy either or both of these exceptions and, therefore, reasonably declined to object for that reason.

More importantly, Terry has not established that he was prejudiced by counsel's failure to object. Contrary to Terry's claim that the evidence allowed the jury to infer that he stole the firearm, the evidence indicated only that the firearm was unregistered, not that it was stolen. Indeed, because the parties stipulated that Terry was not eligible to possess a firearm, it seems more likely that the jury would infer that Terry did not register the firearm for that reason. Regardless, Terry was not charged with possession of an unregistered or stolen firearm, and he did not dispute possessing a firearm during the charged offense. Accordingly, there is no reasonable probability that the evidence affected the jury's verdict.

## D. MISSING SURVEILLANCE VIDEO

Terry argues that defense counsel was ineffective for failing to request an adverse inference instruction pertaining to the gap in the surveillance video recordings. We disagree.

In general, a defendant is not entitled to an adverse inference instruction based on missing evidence unless he can demonstrate that the police destroyed or failed to preserve the evidence in bad faith.[27] In *People v Cress*,[28] this Court explained that an adverse inference may be drawn due to missing evidence if

---

[27] *People v Davis*, 199 Mich App 502, 514-515; 503 NW2d 457 (1993), overruled on other grounds by *People v Grissom*, 492 Mich 296, 319 (2012).

(1) the government acted in bad faith in failing to preserve the evidence, (2) the exculpatory value of the evidence was apparent before its destruction, and (3) the nature of the evidence was such that the defendant would be unable to obtain comparable evidence by other reasonably available means.

An adverse inference instruction is only proper when the connection between the circumstances of the case and the exculpatory value of the missing evidence is so logical that the fact-finder would be permitted to make the inference that the evidence was unfavorable to the prosecution.[29]

In this case, the record does not support Terry's argument that evidence was destroyed or not preserved. Sullivan testified that he obtained all recordings in which Imhotep was visible, but that a gap in the coverage area of Home Depot's outside surveillance system left Imhotep and Terry out of view for 25 to 30 seconds, during which the shooting occurred. This testimony indicates that no surveillance video evidence existed for the location of the shooting, not that such evidence existed and was unpreserved. Terry did not present any evidence disputing the existence of this gap in the coverage area. Accordingly, Terry was not entitled to an adverse inference instruction, and counsel was not ineffective for failing to request the instruction.

Terry also complains that defense counsel failed to effectively argue that the prosecutor was at fault in regard to the video, or that the absence of a recording of the actual shooting established reasonable doubt about Terry's guilt. He complains that defense counsel instead merely stated that he was "not going to accuse Lance Sullivan of altering or leaving stuff out," which Terry characterizes as a weak argument. Defense counsel followed that comment up by stating that he did not know if Sullivan had altered or left anything out, but that it was not unreasonable for Terry to believe that he had done so given Terry's prior unfair experience with the police. Because counsel had no factual basis for arguing that additional video evidence actually existed, defense counsel's resort to a subtle argument instead of overtly arguing that evidence was withheld or destroyed was not objectively unreasonable.

## E. MOTION TO SUPPRESS

Terry argues in a supplemental brief that defense counsel was ineffective for failing to move to suppress evidence seized from his home pursuant to a search warrant, and for failing to suppress evidence obtained from OnStar pursuant to a search warrant. He argues that the affidavit submitted in support of the search warrant for his home, and the application for the OnStar search warrant, both contained knowingly false statements that were necessary to establish probable cause to issue the warrants. He further argues that the OnStar warrant was procedurally defective because it was not issued in accordance with applicable federal statutes.

---

[28] *People v Cress*, 250 Mich App 110, 158; 645 NW2d 669 (2002), vacated in part 466 Mich 883 (2002), rev'd on other grounds 468 Mich 678 (2003).

[29] *People v Fields*, 450 Mich 94, 105-106; 538 NW2d 356 (1995).

"The United States and the Michigan Constitutions both prohibit unreasonable searches and seizures."[30] "A magistrate shall only issue a search warrant when he or she finds that 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.' "[31] Deference is afforded to a magistrate's finding of probable cause, "and a reviewing court must only insure that there is a substantial basis for the magistrate's conclusion that there is a fair probability that contraband or evidence of a crime will be found in a particular place."[32]

Pursuant to *Franks v Delaware*,[33] "if false statements are made in an affidavit in support of a search warrant, evidence obtained pursuant to the warrant must be suppressed if the false information was necessary to a finding of probable cause."[34] "In order to prevail on a motion to suppress the evidence obtained pursuant to a search warrant procured with alleged false information, the defendant must show by a preponderance of the evidence that the affiant had knowingly and intentionally, or with reckless disregard for the truth, inserted false material into the affidavit and that the false material was necessary to a finding of probable cause."[35] If, after the allegedly false information is set aside, there remains sufficient content in the warrant affidavit to support a finding of probable cause, it is not necessary to void the warrant.[36] The burden is on the defendant to establish a deliberate falsehood or reckless disregard for the truth by a preponderance of the evidence.[37]

Terry argues that the search warrant affidavit and the application for the OnStar search both falsely reported that Imhotep's girlfriend, Barreiro, had identified his vehicle as a silver Chevrolet Silverado, and falsely reported that she had identified the address of his residence.[38] Even assuming that these statements were false, we are not persuaded that they were necessary to a finding of probable cause in light of the remaining information in the affidavit and

---

[30] *People v Earl*, 297 Mich App 104, 107; 822 NW2d 271 (2012), aff'd 495 Mich 33 (2014), citing US Const, Am IV; Const 1963, art 1, § 11.

[31] *People v Franklin*, 500 Mich 92, 101; 894 NW2d 561 (2017), quoting *Illinois v Gates*, 462 US 213, 238; 103 S Ct 2317; 76 L Ed 2d 527 (1983).

[32] *People v Stumpf*, 196 Mich App 218, 220; 492 NW2d 795 (1992).

[33] *Franks v Delaware*, 438 US 154, 155-156; 98 S Ct 2674; 57 L Ed 2d 667 (1978).

[34] *Stumpf*, 196 Mich App at 224.

[35] *Id.*

[36] *Franklin*, 500 Mich at 104.

[37] *Id.*

[38] Terry also asserts that the affidavit falsely described the vehicle depicted on Home Depot's video surveillance system as a newer silver Chevrolet Silverado, but we are not persuaded that Terry has established a deliberate falsehood associated with this description merely because witnesses at trial gave varying descriptions of the vehicle. Moreover, Terry does not contend that the description in the affidavit is factually inaccurate.

application.[39]  Further, although we are not able to resolve Terry's procedural challenge to the validity of the OnStar warrant from the limited record presented, we conclude that it is not necessary to do so because we agree with plaintiff that Terry cannot establish that he was prejudiced by defense counsel's failure to file motions to suppress the evidence obtained as a result of the home and OnStar searches.

The only evidence obtained during the search of Terry's home was an empty firearm box and an empty handgun magazine, both for a .45 caliber gun.  The police found two .45 caliber shell casings at the crime scene.  Therefore, the evidence obtained during the search of Terry's home supported an inference that Terry owned a gun consistent with the type of weapon used during the offense.  However, Terry's possession and use of a .45 caliber gun was not a disputed issue at trial.  Terry admitted possessing a gun, carrying it with him to worksites, and using the gun to shoot Imhotep in the Home Depot parking lot.  The principal issue at trial was whether Terry acted in self-defense.  None of the evidence obtained during the search of Terry's home was probative of the issue of self-defense.  Thus, there is no reasonable probability that this evidence affected the outcome of Terry's trial.

Terry argues that the evidence recovered during the home search led to the issuance of the ATF report, which in turn was prejudicial because it allowed the jury to infer that the firearm was stolen.  As discussed earlier in Part II(C), Terry was not prejudiced by the ATF report because it indicated only that the firearm was unregistered, not that it was stolen, and the parties stipulated that Terry was not eligible to possess a firearm.  It was more likely that the jury would infer that Terry did not register the firearm for that reason.  Moreover, Terry was not charged with possession of an unregistered or stolen firearm, and he did not dispute possessing a firearm at the time of the shooting.  Accordingly, there is no reasonable probability that this evidence affected the jury's verdict.

The only evidence produced as a result of the OnStar warrant was the discovery of the location of Terry's truck, which was parked behind a friend's garage.  The location of the truck was not a significant issue in the case and was not probative of whether Terry acted in self-defense.

Terry suggests that if the foregoing evidence had been suppressed, he would not have exercised his right to testify.  There is no basis in the record for crediting this statement.  Initially, there is no suggestion in the record that Terry's decision to testify was influenced by the admission of the evidence obtained from the search of his home or the OnStar search.  It is clear from the record that Terry's purpose in testifying was to provide his version of events in support of a claim of self-defense.  Nothing in the record indicates that this decision was impacted by the evidence recovered during the challenged searches.  Terry has not submitted an affidavit from himself or trial counsel explaining how their strategy would have been different if the evidence obtained as a result of the searches had been suppressed.  To the extent Terry suggests that the

---

[39] We also disagree with Terry's argument that the warrant for the home search, which was issued three days after the Home Depot shooting, was based on stale information.  *Stumpf*, 196 Mich App at 226.

prosecution's ability to connect him to the offense would have been significantly impacted if the home and OnStar evidence had been suppressed, the record does not support such a claim. Even before the searches were conducted, the police had already identified Terry as a suspect, learned about his business relationship and ongoing dispute with Imhotep, and determined that he was the registered owner of the same type of vehicle used by the shooter during the offense. At trial, eye-witness Coker positively identified Terry as the shooter. Suppression of the limited evidence obtained during the home and OnStar searches would not have lessened the impact of this evidence. In short, there is no reasonable basis in the record for concluding that the evidence obtained as a result of the searches was a significant factor in the choice of defense strategies or Terry's decision to testify. For these reasons, Terry has failed to demonstrate a reasonable probability that the outcome of his trial would have been different if the challenged evidence had been suppressed.

Terry raises additional claims of ineffective assistance of counsel pertaining to the jury instructions, sentencing, and the prosecutor's conduct. We will address those claims in conjunction with our analysis of Terry's substantive claims relating to those issues.

## III. JURY INSTRUCTIONS

Terry argues that the trial court erred by erroneously instructing the jury on the felon-in-possession charge, by failing to instruct the jury on the lesser included offense of voluntary manslaughter, and by failing to give a venue instruction. Because Terry did not request an instruction on voluntary manslaughter and did not object to the trial court's felon-in-possession instruction or failure to give a venue instruction, these claims are unpreserved.[40] Moreover, because defense counsel expressly approved the trial court's jury instructions as given, Terry's claims of instructional error are waived, leaving no error to review.[41] Therefore, we will consider Terry's claims only in the context of Terry's related arguments that defense counsel was ineffective for not requesting a manslaughter instruction, and for not objecting to the felon-in-possession instruction or absence of a venue instruction.

## A. VOLUNTARY MANSLAUGHTER INSTRUCTION

"A defendant in a criminal trial is entitled to have a properly instructed jury consider the evidence against him or her."[42] A court is only permitted to instruct on necessarily included lesser offenses, not cognate lesser offenses.[43] "[A] requested instruction on a necessarily included lesser offense is proper if the charged greater offense requires the jury to find a disputed factual element that is not part of the lesser included offense and a rational view of the evidence

---

[40] *People v Pinkney*, 316 Mich App 450, 470; 891 NW2d 891 (2016).

[41] *People v Carter*, 462 Mich 206, 218-219; 612 NW2d 144 (2000); *People v Lueth*, 253 Mich App 670, 688; 660 NW2d 322 (2003).

[42] *Guajardo*, 300 Mich App at 34 (quotation marks and citation omitted).

[43] *People v Reese*, 466 Mich 440, 446; 647 NW2d 498 (2002).

would support it."[44] Voluntary manslaughter is a lesser included offense of murder.[45] Thus, the trial court would have been required to provide an instruction on voluntary manslaughter, upon request, if instruction on that offense was "supported by a rational view of the evidence."[46]

To prove that a defendant committed voluntary manslaughter, the prosecution must demonstrate that "the defendant killed in the heat of passion, the passion was caused by adequate provocation, and there was not a lapse of time during which a reasonable person could control his passions."[47] "Whether the provocation was reasonable is a question of fact; but if no reasonable jury could find that the provocation was adequate, the court may exclude evidence of the provocation."[48] In *People v Roper*,[49] this Court stated that "verbal exchanges" and "minor issues occurring between roommates," "are not usually sufficient to constitute adequate provocation." That case involved arguments over food missing from the refrigerator and the defendant not paying for his own drinks.[50] "As our Supreme Court has explained, '[n]ot every hot-tempered individual who flies into a rage at the slightest insult can claim manslaughter.' "[51]

Terry's theory was that he shot Imhotep in self-defense after Imhotep first fired a gun at Terry. Terry's testimony did not support an inference that the element of malice was "negated by the presence of provocation and heat of passion."[52] Terry does not identify any evidence that supported legal provocation or that showed that he was acting in the heat of passion when he shot Imhotep. The jury could believe or disbelieve Terry's testimony that Imhotep shot at him, but the evidence did not support a "middle ground" in which Imhotep engaged in behavior that did not cause him to reasonably fear imminent death or serious injury, but which provoked him to lose control and kill in the heat of passion. Terry's business difficulties with Imhotep are comparable to the roommate problems found to be insufficient to establish provocation in *Roper*.[53] Because a rational view of the evidence did not support a jury instruction on voluntary manslaughter, defense counsel's failure to request the instruction was not objectively unreasonable.

---

[44] *People v Cornell*, 466 Mich 335, 357; 646 NW2d 127 (2002).

[45] *People v Mendoza*, 468 Mich 527, 540-541; 664 NW2d 685 (2003).

[46] *Id*. at 541.

[47] *Id*. at 535.

[48] *People v Mitchell*, 301 Mich App 282, 287; 835 NW2d 615 (2013) (quotation marks and citation omitted).

[49] *People v Roper*, 286 Mich App 77, 88; 777 NW2d 483 (2009).

[50] *Id*. at 80.

[51] *Id*. at 89 (alteration in original), quoting *People v Pouncey*, 437 Mich 382, 389; 471 NW2d 346 (1991).

[52] See *Mendoza*, 486 Mich at 540.

[53] *Roper*, 286 Mich App 77.

## B.  FELON IN POSSESSION OF A FIREARM

Terry raises three claims of error with respect to the trial court's instruction on felon in possession of a firearm:  (1) that the court omitted the "reasonable doubt" language from the instruction; (2) that the court's reference in the instruction to a "specified felony" invited the jury to speculate on the nature of that felony; and (3) that the trial court failed to give a proper limiting instruction that the jury could not consider Terry's prior felony for any purpose other than the felon-in-possession charge.  Terry argues that defense counsel was ineffective for failing to object to these alleged errors.

The trial court provided the following instruction for the felon-in-possession charge:

Now the defendant is charge[d] in count two with having possessed a firearm after having been convicted of a specified felony.  To prove this charge the prosecutor must prove each of the following elements:

First, that the defendant possessed or used or transported a firearm in this state.

And second, that the defendant was convicted of a specified felony.

Terry first complains that the trial court deviated from the introductory paragraph of M Crim JI 11.38a, which states: "To prove this charge, the prosecutor must prove each of the following elements *beyond a reasonable doubt* . . . ."[54]  Terry argues that the omission of the emphasized language led the jury to believe that the felon-in-possession charge was subject to a lower standard of proof than the murder and felony-firearm charges.  We disagree.

Even if it would have been appropriate for defense counsel to object to the omitted language, Terry cannot establish that he was prejudiced by counsel's failure to do so.  Earlier in its instructions, the trial court instructed the jury that

[e]very crime is made up of parts called elements.  The prosecutor must prove each element of the crime beyond a reasonable doubt.

. . . If you find that the prosecutor has not proven every element beyond a reasonable doubt then you must find the defendant not guilty.

The jury is presumed to follow its instructions,[55] and jury instructions are to be examined "in their entirety to determine if error requiring reversal occurred."[56]  We note that Terry stipulated at trial that he was not eligible to possess a firearm because of a prior felony conviction, and he

---

[54] Emphasis added.

[55] *People v Abraham*, 256 Mich App 265, 279; 662 NW2d 836 (2003).

[56] *People v Aldrich*, 246 Mich App 101, 124; 631 NW2d 67 (2001).

conceded in his testimony that he possessed the firearm that he used to shoot Imhotep. Considering the trial court's earlier instruction on reasonable doubt, the parties' stipulation, and the undisputed testimony that Terry possessed and used a firearm to kill Imhotep, there is no reasonable likelihood that the outcome of trial would have been different if defense counsel had requested that the trial court correct the felon-in-possession instruction by adding the omitted language.

Terry next argues that defense counsel should have objected to the use of the word "specified" in the court's jury instruction. M Crim JI 11.38a(2) provides, in pertinent part, that the jury must find that "the defendant was convicted of [*name specified felony*]." The use note for this portion of the instruction states:

> The judge, not the jury, determines whether the charged prior felony is a "felony" as defined in MCL 750.224f(9)(b), or a more serious "specified felony" as defined in MCL 750.224f(10). The jury determines whether the defendant has in fact been convicted of that charged prior felony.[57]

Terry observes that the question of whether he was convicted of a "specified felony" was not a jury question and argues that use of the word "specified" invited the jury to speculate on the nature of his prior conviction. Terry also argues that trial counsel was ineffective for not requesting a limiting instruction in accordance with *People v Green*,[58] in which this Court addressed safeguards that "can be erected to ensure that a defendant charged with both felon-in-possession and other charges arising from the same incident suffers no unfair prejudice if a single trial is conducted for all the charges." These safeguards include:

> (1) the introduction by stipulation of the fact of the defendant's prior conviction, (2) a limiting instruction emphasizing that the jury must give separate consideration to each count of the indictment, and (3) a specific instruction to consider the prior conviction only as it relates to the felon-in-possession charge.[59]

The Court in *Green* concluded that although defense counsel failed to request the instruction to consider the prior conviction only as it relates to the felon-in-possession charge, the other safeguards were in place, and therefore, "manifest injustice will not result from our failure to review this issue."[60]

Terry argues that he was prejudiced by the dual errors of using the "specified felony" language and failing to implement the third safeguard stated in *Green*. Terry's claim involving the use of the term "specified felony" is premised on the assumption that the jury would give

---

[57] M Crim JI 11.38a n 4.

[58] *People v Green*, 228 Mich App 684, 691; 580 NW2d 444 (1998).

[59] *Id*. at 691-692.

[60] *Id*. at 692.

undue consideration to that language, causing it to speculate regarding the nature of his prior conviction. This assumption is unwarranted. The jury was not instructed on the significance of the term "specified." The parties stipulated that Terry was previously "convicted of a felony and had not restored his right to be in possession of a firearm." Viewed against this backdrop, there is no reasonable probability that use of the term "specified" affected the outcome of Terry's trial.

Terry's argument that defense counsel was ineffective for not requesting "safeguard (3)" from *Green* ignores that, in *Green*, this Court concluded that failure to employ the third safeguard did not require appellate relief. Likewise, there is no reasonable probability that the outcome of Terry's trial would have been different if the limiting instruction had been given, especially considering that Terry did not contest the allegation that he possessed the firearm that he used to shoot Imhotep. The principle issue for the jury to decide was whether to accept or reject Terry's claim of self-defense. Under these circumstances, Terry was not prejudiced by defense counsel's failure to request the third *Green* safeguard.

## C. VENUE

Terry correctly asserts that the trial court failed to give the general venue instruction,[61] which states, "The prosecutor must also prove beyond a reasonable doubt that the crime occurred on or about [*state date alleged*] within _____ County." However, there was no dispute that the shooting occurred in Detroit, within the boundaries of Wayne County. Because the location of the shooting was not a disputed issue for the jury to decide, Terry was not prejudiced by defense counsel's failure to object to the omission of this instruction.

## IV. PROSECUTORIAL MISCONDUCT

Terry argues that numerous improper comments and conduct by the prosecutor denied him a fair trial. Terry failed to object to the alleged instances of misconduct at trial. Therefore, Terry's claims are unpreserved.[62] "The test of prosecutorial misconduct is whether the defendant was denied a fair and impartial trial (i.e., whether prejudice resulted)."[63] However, "[w]here a defendant fails to object to an alleged prosecutorial impropriety, the issue is reviewed for plain error."[64] "[T]o avoid forfeiture of the issue, defendant must demonstrate plain error that affected his substantial rights, i.e., that affected the outcome of the proceedings."[65] "Prosecutorial comments must be read as a whole and evaluated in the light of defense arguments and the relationship they bear to the evidence admitted at trial."[66]

---

[61] M Crim JI 3.10.

[62] *People v Bennett*, 290 Mich App 465, 475; 802 NW2d 627 (2010).

[63] *Abraham*, 256 Mich App at 272.

[64] *Aldrich*, 246 Mich App at 110.

[65] *Id.*

[66] *People v Brown*, 279 Mich App 116, 135; 755 NW2d 664 (2008).

## A. IMPROPER ARGUMENT

Terry argues that the prosecutor improperly appealed to the jury's sympathy and urged it to speculate about what Imhotep would have to say if he survived. This argument refers to the prosecutor's statement in closing argument that "Imhotep did not get a chance to tell his side of the story" and the prosecutor's request to the jury to "keep in the back of your mind the fact that we can never know because [Imhotep]'s not here to tell the facts." A prosecutor is generally given "great latitude regarding his or her arguments and conduct at trial."[67] "[P]rosecutors may use 'hard language' when it is supported by evidence and are not required to phrase arguments in the blandest of all possible terms."[68] "Emotional language may be used during closing argument and is an important weapon in counsel's forensic arsenal."[69] But "[a] prosecutor may not appeal to the jury to sympathize with the victim. Nor may a prosecutor urge the jury to convict as part of its civic duty or on the basis of its prejudices."[70]

The prosecutor's statements asking the jury to consider what Imhotep would have said if he had not been killed were neither blatant appeals for sympathy nor arguments based on speculation. The principal factual issue at trial was whether Terry shot Imhotep in self-defense. Terry testified at trial to provide his version of events, but Imhotep could not do the same. Accordingly, the prosecutor's case relied on circumstantial evidence and reasonable inferences arising from that evidence. Asking the jury what Imhotep would have said referred to the process of drawing those inferences. The statements were only mildly emotional and within the bounds of acceptable argument. Moreover, any perceived prejudice could have been cured by a cautionary instruction upon request. Even without an objection, the trial court acted to protect Terry's substantial rights by instructing the jury that it "must not let sympathy or prejudice influence your decision," that it was to decide the case by "only consider[ing] the evidence that has been properly admitted in this case," and that "[t]he lawyers statements and arguments are not evidence." In light of these instructions, which the jury is presumed to have followed,[71] Terry was not prejudiced by the prosecutor's arguments.

Terry argues that the prosecutor improperly asked the jury to speculate on the reasons why Terry's name arose in the police investigation. This argument pertains to the prosecutor's statement that the police were given Terry's name when they searched for a suspect. The prosecutor stated, "We don't know why the family gave him that particular name but obviously there was enough of concern that name had to be given over to the officers that's how they begin their investigation this name given by family members." Terry argues that these remarks

---

[67] *People v Fyda*, 288 Mich App 446, 461; 793 NW2d 712 (2010).

[68] *People v Ullah*, 216 Mich App 669, 678; 550 NW2d 568 (1996).

[69] *Id*. at 679 (quotation marks and citation omitted).

[70] *People v Unger*, 278 Mich App 210, 237; 749 NW2d 272 (2008) (citations omitted).

[71] *Abraham*, 256 Mich App at 279.

violated the trial court's pretrial ruling prohibiting the prosecutor from presenting information that Imhotep had relayed to friends and family about his relationship with Terry. However, the prosecutor never revealed the substance of any such information and, therefore, did not violate the court's ruling. To the extent that the remarks could be considered improper, Terry was not prejudiced considering that the reasons why family members gave Terry's name were never disclosed, and Terry admitted at trial that he and Imhotep no longer had a good working relationship. Further, the trial court's instructions that the jury was to decide the case by "only consider[ing] the evidence that has been properly admitted in this case" and that "[t]he lawyers statements and arguments are not evidence" were sufficient to protect Terry's substantial rights.

Terry argues that the prosecutor encouraged the jury to consider issues broader than his guilt or innocence by stating in rebuttal argument that defense counsel wanted the jury to believe that "Detroit is such a craven opportunistic run down place that any old person is going to walk onto a crime scene with a person dying[,] grab a gun[,] and walk away." Terry argues that this comment invited the jury to make its verdict a "referendum on Detroit." A prosecutor may not urge the jury "to convict as part of its civic duty or on the basis of its prejudices."[72] Viewed in context, the prosecutor's statement was not an appeal to the jury's sense of civic pride in Detroit or prejudices against persons with negative attitudes toward Detroit. The prosecutor was commenting on the improbability that Imhotep possessed a gun, which someone had removed from the scene. Moreover, the prosecutor's remarks were responsive to defense counsel's closing argument in which he referred to Detroit as a place where this might happen. The prosecutor simply asked the jury to reject defense counsel's cynical view. Although these arguments invoked stereotypes and prejudices about the city of Detroit, the remarks were not reasonably calculated to call for a "referendum" on the city. Viewed in context, and considering their responsive nature, the remarks were not improper.

Terry argues that the prosecutor misstated the law on self-defense during closing argument and shifted the burden of proof to Terry to prove self-defense. Terry cites the prosecutor's statement, in reference to self-defense, that "[y]ou have to be absolutely sure it is actually necessary." He states that this argument promoted an "absolutely sure" standard for determining self-defense, which is higher than the legal standard that a defendant must have "honestly and reasonably believed" that he was in danger of imminent death or serious bodily harm.[73] Terry also argues that the prosecutor shifted the burden of production of evidence to Terry by commenting that no person came forward with Imhotep's gun, and that no person testified to hearing more gunshots.

We agree that the prosecutor's "absolutely sure" remark misstated the standard for self-defense. "A prosecutor's clear misstatement of the law that remains uncorrected may deprive a defendant of a fair trial."[74] "However, if the jury is correctly instructed on the law, an erroneous

---

[72] *Unger*, 278 Mich App at 237.

[73] MCL 780.972(1)(a).

[74] *People v Grayer*, 252 Mich App 349, 357; 651 NW2d 818 (2002).

legal argument made by the prosecutor can potentially be cured."[75]   In this case, almost immediately after his misstatement of the law, the prosecutor also reiterated the jury instruction for self-defense, including the sentence, "He must have honestly and reasonably believed that he was in danger of being killed seriously injured . . . ."   In addition, the trial court properly instructed the jury on self-defense and advised the jury that it must "take the law as I give it to you" and "[i]f a lawyer says something different about the law follow what I say."   Thus, the prosecutor's misstatement was corrected and the jury was properly instructed on self-defense. The isolated misstatement does not require reversal.

Terry argues that the prosecutor shifted the burden by stating in rebuttal that Terry failed to explain how Imhotep's cell phone sustained bullet damage if Imhotep had one hand on the steering wheel and the other on his gun.   Viewed in context, this argument did not shift the burden of proof or challenge Terry to produce evidence, but was merely a comment on the improbability of the defense theory that Imhotep possessed a gun where the evidence also supported an inference that he was holding a cell phone in one hand and holding onto the steering wheel with the other hand.

Terry argues that the prosecutor improperly denigrated defense counsel by using the terms "ridiculous" and "preposterous" to describe defense counsel's argument that Imhotep's gun was stolen from the crime scene.   "A prosecutor is afforded great latitude regarding his or her arguments and conduct at trial."[76]   "But the prosecutor may not suggest that defense counsel is intentionally attempting to mislead the jury."[77]   "This prohibition is based on the negative effect such an argument has on the presumption of innocence[.]"[78]   Viewed in context, the prosecutor's use of the words "ridiculous" and "preposterous" referred specifically to Terry's "second gun" theory.   The prosecutor gave reasons, grounded in the evidence, for why the jury should reject this theory.   The comments were not a personal attack on defense counsel, but a comment on the implausibility of the defense theory in light of the evidence presented at trial. The remarks were not improper.

## B. *BRADY*[79] VIOLATION

Terry argues that the prosecutor violated his right to due process by failing to produce the entire portion of the video recording, specifically the portion that captured the shooting.   A criminal defendant has a due process right to obtain exculpatory evidence possessed by the

---

[75] *Id.*

[76] *Fyda*, 288 Mich App at 461.

[77] *Id*.

[78] *Id*.

[79] *Brady v Maryland*, 373 US 83, 87; 83 S Ct 1194; 10 L Ed 2d 215 (1963).

prosecution if it would raise a reasonable doubt about the defendant's guilt.[80]   In *People v Stokes*,[81] this Court explained:

> A defendant has a due process right of access to certain information possessed by the prosecution.  A *Brady* violation occurs if: (1) the prosecution has suppressed evidence; (2) that is favorable to the accused; and (3) that is material. The government is held responsible for evidence within its control, even evidence unknown to the prosecution, without regard to the prosecution's good or bad faith. Evidence is favorable to the defense when it is either exculpatory or impeaching. To establish materiality, a defendant must show that there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.[82]

Terry is unable to satisfy the first requirement.  As explained previously, there is no evidence that a video recording of the actual shooting existed and was possessed by the prosecution. Sergeant Sullivan testified that he obtained all recordings in which Imhotep was visible, but determined that there was a gap in the coverage area of Home Depot's outside surveillance system that left Imhotep and Terry out of view for 25 to 30 seconds, during which the shooting occurred.  Because the testimony indicated that a video of the actual shooting did not exist, and Terry did not present any evidence disputing the existence of this gap in coverage area, Terry has failed to demonstrate a *Brady* violation.

## C. INEFFECTIVE ASSISTANCE OF COUNSEL

We have concluded that, with the exception of the prosecutor's argument misstating the threshold for justifying the use of deadly force in self-defense, Terry's claims of prosecutorial misconduct are without merit.  The prosecutor's remarks were not clearly improper and the trial court's jury instructions were sufficient to alleviate any perceived prejudice.  Accordingly, defense counsel's failure to object was not objectively unreasonable, and Terry was not prejudiced by the lack of an objection.

With respect to the prosecutor's isolated misstatement regarding the standard for determining self-defense, although defense counsel did not object at the time of the misstatement, counsel did respond in his own closing argument and pointed out that the "absolutely sure" language used by the prosecutor was not in the jury instruction.  Choosing to directly address the prosecutor's statement by referring to the jury instruction rather than objecting and requesting a curative instruction was a strategic choice, which we will not second guess.

---

[80] *People v Stanaway*, 446 Mich 643, 666; 521 NW2d 557 (1994).

[81] *People v Stokes*, 312 Mich App 181, 190; 877 NW2d 752 (2015), vacated in part on other grounds ___ Mich ___ (2017) (Docket No. 152500).

[82] Quotation marks and citation omitted.

## V. SENTENCING

Lastly, Terry argues that his sentence of 40 to 80 years for second-degree murder violates his constitutional rights against cruel or unusual punishment. Terry was sentenced within the sentencing guidelines range for second-degree murder and did not advance a claim below that such a sentence was unconstitutionally cruel or unusual. Therefore, this issue is unpreserved.[83] We typically review constitutional questions de novo.[84] But an unpreserved claim that a sentence is unconstitutionally cruel or unusual is reviewed for plain error affecting defendant's substantial rights.[85] Terry further argues, however, that he was deprived of the effective assistance of counsel at sentencing. Accordingly, we will also review Terry's claims in that context.

The United States Constitution prohibits cruel and unusual punishment.[86] The Michigan Constitution prohibits cruel *or* unusual punishment.[87] "If a punishment 'passes muster under the state constitution, then it necessarily passes muster under the federal constitution."[88] "In deciding if punishment is cruel or unusual, this Court looks to the gravity of the offense and the harshness of the penalty, comparing the punishment to the penalty imposed for other crimes in this state, as well as the penalty imposed for the same crime in other states."[89] The advisory sentencing guidelines are relevant in evaluating Terry's claim that his sentence of 40 to 80 years constitutes cruel or unusual punishment because "[a] sentence within the guidelines range is presumptively proportionate, and a proportionate sentence is not cruel or unusual."[90]

In this case, Terry's minimum sentence of 480 months for his second-degree murder conviction was in the lower half of his sentencing guidelines range of 315 to 1050 months or life, as enhanced for a fourth-offense habitual offender.[91] Terry argues that the trial court's assessment of 50 points for prior record variable (PRV) 1 overstates the seriousness of his criminal record. A score of 50 points is appropriate for PRV 1 where "[t]he offender has 2 prior high severity felony convictions," and a score of 25 points is appropriate where "[t]he offender has 1 prior high severity felony conviction."[92] Terry does not dispute that his criminal record technically supported the trial court's assessment of 50 points for PRV 1. Instead, he argues that

---

[83] *People v Bowling*, 299 Mich App 552, 557; 830 NW2d 800 (2013).

[84] *People v Brown*, 294 Mich App 377, 389; 811 NW2d 531 (2011).

[85] *Id*.

[86] US Const, Am VIII; *People v Costner*, 309 Mich App 220, 232; 870 NW2d 582 (2015).

[87] Const 1963, art 1, § 16; *Costner*, 309 Mich App at 232.

[88] *Costner*, 309 Mich App at 232 (quotation marks and citation omitted).

[89] *Brown*, 294 Mich App at 390.

[90] *Bowling*, 299 Mich App at 558.

[91] MCL 777.21(3)(c); MCL 777.61.

[92] MCL 777.51(1)(b) and (c).

the points assessed for PRV 1 overstated the severity of his record because his prior conviction for arson was not very serious, as it involved a fire that was confined to a calendar hanging and he only received a probationary sentence for that conviction. Terry also argues that defense counsel was ineffective for failing to argue that the scoring of PRV 1 did not properly reflect the seriousness of his prior record. We reject Terry's arguments for several reasons.

First, the presentence report accurately indicated that Terry only received a probationary sentence for his prior arson conviction. Therefore, the trial court would have been aware of that fact at sentencing. Second, there is no indication in the record that the trial court placed any undue reliance on the prior arson conviction when imposing Terry's sentence. Although the trial court did mention that Terry had a prior criminal history, it did not specifically reference the arson conviction. Third, Terry's total PRV score was based on a criminal history that extended well beyond the arson conviction. Terry received a total PRV score of 85 points, placing him in PRV Level F (75+ points), the highest category of criminal offenders. Although Terry does not dispute that this score is factually accurate, even if the additional 25 points attributable to the scoring of the arson conviction were to be discounted, thus reflecting a criminal record deserving of placement in PRV Level E (50-74 points) instead of PRV Level F, the corresponding guidelines range for an E-II offender, as enhanced for Terry's status as a fourth-offense habitual offender, would be 270 to 900 months' or life imprisonment.[93] Terry's minimum sentence of 480 months would still be in the lower half of that range. Therefore, it would still be presumptively proportionate and, thus, not cruel or unusual punishment.[94]

Terry argues that the trial court's sentence is inconsistent with the jury's finding that he did not commit first-degree murder. This argument is without merit. The trial court never expressed a belief that Terry was guilty of first-degree murder, and the court sentenced Terry within the guidelines range for second-degree murder, which is punishable by imprisonment "for life, or any term of years."[95] The trial court's sentence is consistent with the authorized punishment for second-degree murder, and the fact that the sentence is within the guidelines range for that crime suggests that it represents an appropriate exercise of sentencing discretion for that offense. Terry's argument that his age made the court's sentence akin to "a nonparolable life sentence" is unpersuasive because the sentencing court is not required to treat similarly situated offenders differently on the basis of advanced age.[96]

In sum, Terry has not identified any unusual circumstances to overcome the presumption that his sentence qualifies as proportionate. Because a proportionate sentence is not cruel or unusual, we reject Terry's argument that his sentence of 40 to 80 years for second-degree murder is unconstitutional.

---

[93] MCL 777.21(3)(c); MCL 777.61.

[94] *Bowling*, 299 Mich App at 558.

[95] MCL 750.317.

[96] *People v Lemons*, 454 Mich 234, 259; 562 NW2d 447 (1997).

Terry's related claim that defense counsel was ineffective at sentencing for not arguing that his PRV score overstated the seriousness of his criminal record is similarly unpersuasive. The presentence report accurately reflected that Terry received a probationary sentence for the arson conviction, the conviction did not significantly add to the overall seriousness of Terry's criminal record, and the trial court did not identify the conviction as a significant factor in its sentencing decision. Accordingly, counsel's failure to single out that conviction and use it as a basis for leniency at sentencing was not objectively unreasonable. Counsel instead reasonably focused on the nature of the offense for which Terry was being sentenced and argued that the court should still consider the possibility that the victim possessed a gun and impose a sentence "near the bottom of the guidelines."

Terry also complains that defense counsel failed to advise the trial court that the sentencing guidelines were only advisory. Our Supreme Court declared the guidelines advisory in *People v Lockridge*,[97] which was decided in July 2015. Terry was sentenced almost a year later. A trial court is presumed to know the law unless the contrary is clearly shown.[98] Terry does not contend that the trial court was unaware of *Lockridge*, and nothing in the record suggests that the trial court did not understand that the guidelines were only advisory. Absent any indication that the trial court was acting under a misapprehension that the guidelines were mandatory, defense counsel was not ineffective for failing to inform the court that the guidelines were advisory.

Affirmed.

/s/ Michael J. Talbot
/s/ Christopher M. Murray
/s/ Colleen A. O'Brien

---

[97] *People v Lockridge*, 498 Mich 358, 364-365; 870 NW2d 502 (2015).

[98] *People v Alexander*, 234 Mich App 665, 675; 599 NW2d 749 (1999).